Filed 6/30/21  P. v. Mack CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C087380 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE020152) |
| v. | |
| ERIC LAWRENCE MACK, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

On September 30, 2016, the 74-year-old victim was struck by a white Cadillac with a black roof while he was crossing Florin Road near Stockton Boulevard in Sacramento County.  The victim sustained a broken neck and other injuries.  One testifying eyewitness saw the impact and two others heard it.  All three saw the Cadillac drive away without stopping.  The Cadillac's passenger-side mirror was found next to the victim.  Shortly thereafter, at a gas station within a mile or two of the incident, a

1

Sacramento County Sheriff's Deputy approached defendant near his white Cadillac with a black roof. The passenger-side mirror was missing.

A jury found defendant guilty of felony leaving the scene of an injury accident in violation of Vehicle Code section 20001, subdivision (a) (statutory section references that follow are to the Vehicle Code unless otherwise stated). On appeal, defendant asserts (1) the evidence was legally insufficient to support the verdict, (2) the trial court erred in failing to instruct the jury sua sponte on causation of the accident and injuries in its CALCRIM No. 2140 instruction, (3) the trial court erred by refusing to give a bracketed portion of CALCRIM No. 226 directing the jurors they may disbelieve all of a witness's testimony if they found the witness deliberately lied, and (4) the trial court erred in sentencing defendant to the midterm sentence based on impermissible factors.

We affirm the judgment.

### FACTS AND HISTORY OF THE PROCEEDINGS

In a felony complaint deemed an information, defendant was charged with a single count of felony leaving the scene of an injury accident. (§ 20001, subd. (a).) Prior to trial, the trial court granted defendant's motion to represent himself. (See *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562].)

*The Prosecution Evidence*[1]

Janisha Word was crossing the street with her sister, Mya Mayfield, at the corner of Florin Road and Stockton Boulevard in September 2016. Word saw the victim crossing Florin Road southbound. The police " 'blurped' him and told him to get out the street." By "blurped," Word meant that the police flashed their lights and made a " 'blurp' " sound "that they do with their police cars to warn . . . somebody of

---

[1] The victim did not testify as he died before trial. It was not alleged in this prosecution that the September 30, 2016 accident resulted in the victim's death.

something."  The victim was in the middle of the street when the police " 'blurped' " him and told him over the speaker to get out of the street.  The police officer then kept going.

Word paid attention to the victim because she saw cars coming and thought he was about to get hit.  Word then saw a white car she believed to be a Cadillac.  She believed the car was traveling in the far-right lane, and that the victim was approximately two feet from the curb.  Word saw the white car hit the victim, and the victim flew into the air and then hit the ground.  She was certain it was the white car that hit the victim.  She heard a "loud boom," "like something got hit."  Word estimated the victim went two or three feet off the ground.  "He kind of fell back to the left side of the car.  Once he got hit, he kind of went back into the street a little bit."  Asked what side of the car struck the victim, Word responded, "most likely the right side, because . . . when he got hit, there was a mirror.  The mirror from the car was sitting right there."  On cross-examination, Word again testified that it was the right side of the vehicle that hit the victim.  Word estimated she was 20 feet from the white car when it hit the victim.

After the white car hit the victim, it "just keeps going," turning right on Stockton Boulevard.  The vehicle continued traveling at about the same speed as it was traveling when it struck the victim.  Word did not hear any noise coming from the white car.  Word saw the car's white mirror on the ground next to the victim where the curb met the street.

Word testified that she gave a statement to someone at the scene of the accident.  The officer took her name and number, and he told her that if they had any further questions, they would contact her.  She testified her statement should have been in the police report because she did give a statement.  The parties do not dispute that the police report did not contain a statement from Word.  Word first spoke with an investigator from the prosecutor's office a month and a half to two months prior to trial.

Word's sister, Mya Mayfield, testified that she was with Word at Florin Road and Stockton Boulevard at the time.  They were in the middle of the intersection crossing Stockton Boulevard.  When Mayfield first saw the victim, he was "[r]ight in the middle

3

of the street" and was perhaps 10 to 12 feet away. He was not in a crosswalk and was jaywalking southbound across the Florin Road. Mayfield testified: "He was in the middle of the street, because I had just looked up and seen him go by, because an officer that actually put on her alert, and when she put on her alert, I looked up to see, like, what was I doing wrong, because I didn't know who she was 'crawking' for, and that's when I seen the old man." She clarified that a police officer "bleep-bleeped at" the victim. She heard "the sound that the police make for you to, like, get out the street." She heard that sound, looked up, and saw a police officer yelling, "*Get out the street . . . .*"

Mayfield lost sight of the victim but then heard a loud thump sound and saw the victim "in the air and hit the ground." Asked whether the victim was closer to the curb or in the middle of Florin Road, Mayfield responded, "I guess it would be closer to the curb, because, as I recall, the car had kind of turned the corner there . . . ." She did not see the vehicle hit the victim and she did not know what part of the vehicle hit him. Mayfield then saw a white Cadillac turning the corner "[r]ight in the center of America's Tire." The Cadillac "hit the corner to take off." She heard the "tires of it, pulling off." She did not hear any music coming from the car. The car never stopped. "It just turned at the corner by the tire place and kept going." "It was driving pretty fast," and pulled off "really fast." The car turned right and crossed two lanes and continued in the furthest lane on the left. Mayfield found a car's mirror near the victim.

At 5:52 p.m., Mayfield called 911 and the call was played for the jury. Mayfield reported that "this man just got hit and he's, like, on the floor, like, pouring blood out." Mayfield reported the victim was hit by a white Cadillac. She reported that the vehicle "did not stop. I don't know. I just see him right here. Um, I - I - I just seen a car hit him and keep going."

Maria Castro Arguello (Castro Arguello) was in the parking lot of the tire shop at Florin Road and Stockton Boulevard. She was walking towards two mechanics when she heard a loud noise, "like a loud bang." She did not see any impact, she just heard the

4

noise. She also heard people screaming. Castro Arguello and both mechanics looked to the street. Then "a car drove right -- like, right past [her] face." Castro Arguello testified that there was a line of cars in the street waiting to turn right, so the driver of the car "just cut over the sidewalk and through the tire shop . . . parking lot and out behind the Burger King towards Stockton." The car was "[p]robably" a Cadillac, silver or off-white, with a black convertible top. The right mirror of the car was missing. An older light-skinned African-American male wearing a white T-shirt was driving the car. According to Castro Arguello, the car passed so close to her that, had she been "two feet farther up," she likely would have been hit by the car. Castro Arguello did not hear any noise coming from the car; it "just zoomed right past" her.

On cross-examination, defendant asked Castro Arguello how she knew which car hit the victim if she did not see the impact. She responded: "Because it only makes sense. Umm, why somebody would drive off going at least 50 miles an hour, umm, from the middle lane and driving over the sidewalk and just leaving, it would only make sense." Defendant then asked Castro Arguello whether she had testified she did not see the vehicle in any lane, and she responded: "Correct, because I did not see the point of impact, but can -- being that the man was lying in the turning lane, I would assume that [the] vehicle wasn't in the turning lane, and obviously the car wouldn't drive through the turning lane while the man is laying there after he's gotten hit. [¶] So it's only an assumption that the man was coming from the middle lane and then over the sidewalk and towards Stockton Boulevard."

The victim was still in the road about five feet from the sidewalk, and other people helped move him towards the sidewalk. He had been injured on the back of his head, and he was bleeding profusely. Castro Arguello testified that the car's right-side mirror was found at the scene.

At 5:52 p.m., Castro Arguello called 911. Castro Arguello's 911 call was played for the jury.

5

We note that, on appeal, defendant incorrectly claims only one 911 call was played for the jury. Mayfield's and Castro Arguello's 911 calls were both on the same recording, People's exhibit 12. Both were played for the jury from the same recording. This caused some confusion, as defendant, representing himself and cross-examining Mayfield, initially did not realize the recording included both calls.

Castro Arguello stated she was calling to report "somebody just got ran over by a car." She reported the victim was "bleeding out of his head." Asked what kind of car hit the victim, Castro Arguello responded, "It was a - you said it was a white - white Cadillac with a black male driving." Castro Arguello reported that the Cadillac "drove through the America's Tires and he went through the back." She stated she did not get the license plate of the car that hit the victim, but further stated, "[w]e have a piece of the car." Castro Arguello reported that the driver was black, possibly wearing a white T-shirt.

On September 30, 2016, at approximately 6:00 p.m., Sacramento Sheriff's Deputy Darren Allbee was stopped at a traffic light approximately one to two miles from the location where the victim was hit when he saw a white Cadillac traveling south in the righthand turn lane on Power Inn Road. Instead of turning, however, the Cadillac continued straight at a high rate of speed, faster than the flow of traffic. Allbee pulled in behind the white Cadillac and followed it "to try to determine what was going on with it, if it was a[n] intoxicated driver or somebody just driving reckless." The Cadillac drove in the center "suicide" lane for "quite a ways" amidst heavy traffic in the other lanes. During this time, Allbee heard a broadcast reporting a hit-and-run accident with a pedestrian.

As Allbee followed the Cadillac, it turned into a gas station and Allbee followed. Right before the Cadillac turned into the gas station, Allbee heard another broadcast indicating that it was a white vehicle involved in the hit-and-run accident. As he pulled into the gas station, Allbee "immediately noticed that the passenger[] side mirror had been knocked off or was missing from the" Cadillac. Allbee heard another broadcast

6

describing the vehicle involved in the accident as a white Cadillac with a black male adult driver. Allbee described the vehicle he followed into the gas station: "a white Cadillac with a black male adult driver."

Allbee subsequently learned that one of the officers at the scene of the accident described the vehicle as a white Cadillac, possibly a convertible, with a "black rag top." Allbee testified: "So the vehicle -- the base on the vehicle is white, and it has the black, I guess, cloth top . . . on the top roof of the vehicle."

Allbee got out of his car and walked to the white Cadillac. He again noticed the passenger-side mirror was missing. The passenger-side window was down, and the wiring that would have connected into the missing mirror for a defroster or a power-adjusting mirror was on the inside of the car. "[I]nstead of hanging on the outside of the car, the window was down and the wires were hanging on the inside panel of the passenger door." Other than the missing mirror, Allbee did not recall seeing any other damage to the car.

As Allbee walked up to the white Cadillac, he did not hear any music or any other noise coming from the vehicle. Allbee spoke to the driver of the white Cadillac, defendant. According to Allbee, defendant was upset and was asking why Allbee was pulling him over.

A mirror was brought to Allbee from the scene of the accident. The mirror matched the white Cadillac.

After leaving the site of the accident, Mayfield was driving to the freeway when she saw the Cadillac again at a gas station. She "seen him surround[ed] with the police." Mayfield "assume[d] that they had caught the . . . driver."

Police had Castro Arguello view a man at a gas station. She identified the car as the one she had seen, but she could not positively identify the man.

*Defense* *Evidence*

Chris Kauderer, a traffic accident reconstructionist, testified as an expert for the defense. Kauderer testified that, for a pedestrian to be hit by a car and fly up into the air, "the initial contact has to happen below your center of mass." That would mean that, if the victim here flew into the air, he would have had to have been hit below the waist. Kauderer continued: "If we believe that the contact happened from the rearview mirror, the outside rear mirror, that's certainly going to be -- the gentleman that was struck was five-foot-six, that's certainly going to be above his center of mass . . . and, instead, he would not be projected up in the air, he would have been knocked straight down."

Kauderer testified that, "if a pedestrian was walking southbound, was coming from the left to [the] right with respect to the driver, it would be highly unlikely . . . that the pedestrian would come across the face of the car and . . . only be struck by just the outside mirror." "[V]ery rarely, if hardly ever," had Kauderer seen that the side mirror of a vehicle was "the only thing that comes into play." It is common for the door or the fender or the windshield to also make contact. Kauderer saw no indication in the reports and photographs that suggested that any other part of the car contacted the victim. Additionally, "being clipped by the mirror would be totally inconsistent with being projected through the air, as the witness' statement said in the police report."

Kauderer further testified that the reported distance the victim traveled on impact, 10 feet, was not consistent with a vehicle traveling 50 miles per hour.

In preparing to testify, Kauderer reviewed the police report and paper discovery. He did not review the victim's medical records. He did not speak to any witnesses. He also did not visit the accident scene, he did not see photographs of the accident scene, and he performed no type of reconstruction. Kauderer did not inspect defendant's vehicle. Kauderer agreed that he "[j]ust essentially looked at the police report."

8

Kauderer also acknowledged on cross-examination that there was no indication in the police report of any vehicle-pedestrian impact other than that between defendant's vehicle and the victim. There was no mention of any other vehicle striking the victim.

Asked by the prosecutor if he was testifying that defendant's car did not hit the victim, Kauderer responded: "I am saying there is doubt that it was the Defendant's car, yes, based on the -- where the officer said the impact took place and the description of the witness as to how the body was projected through the air, I definitely think there's doubt that [defendant's] -- only [defendant's] rearview mirror hit the pedestrian. Yes, I think there is doubt about that." He subsequently testified, "I would say that the limited materials that I reviewed put into question, again for the reasons that I have explained numerous times, that it only was [defendant's] car . . . ."

During Kauderer's testimony, defendant played a video Kauderer prepared using defendant's vehicle to demonstrate how the side mirror on the vehicle was designed to collapse inward. The video was "just to show that when contact is made, even with the human body, to the side of that mirror, that mirror collapses in, and it does not sheer off." Kauderer testified that the only way the mirror would come off would be a vertical force, not a horizontal force.

Defendant also called California Highway Patrol Officer Anthony Dixon. Dixon testified there was damage to the right side mirror of defendant's car, and that he did not recall any other damage to the vehicle. Dixon also testified that he saw a sound system with speakers in the trunk of the vehicle.

On cross-examination, Dixon testified that the only witness from whom he took a statement was Castro Arguello. He testified it is common in investigations for different officers to contact different witnesses.

9

<u>*Verdict*</u> <u>*and*</u> <u>*Sentence*</u>

The jury found defendant guilty of felony leaving the scene of an injury accident. (§ 20001, subd. (a).) The trial court sentenced defendant to the midterm of two years. (§ 20001; Pen. Code, § 18, subd. (a).)

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant argues the evidence was insufficient to support his conviction. Specifically, he says the evidence was insufficient to establish his car was a legal cause of the victim's severe injuries or that he possessed the requisite element of knowledge that his car struck and likely caused injury to the victim. According to defendant, the evidence was insufficient to "establish that a glancing blow to [the victim] by [defendant's] collapsible mirror legally *caused* his severe injuries or establish that [defendant] had *knowledge* that there might have been injuries."

"The law governing sufficiency-of-the-evidence challenges is well established . . . . [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. [Citation.] If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the

10

circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).) In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

Section 20001, subdivision (a), provides: "The driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in the death of a person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of Sections 20003 and 20004." "[S]ections 20003 and 20004, in turn, require the driver to stop and provide identification and render aid to the victim, as well as to report the accident to authorities if there is no police officer present. Failure to comply with these requirements is a criminal offense." (*People v. Martinez* (2017) 2 Cal.5th 1093, 1102 (*Martinez*).)

To prove defendant guilty of violation of section 20001, the prosecution had to prove: (1) defendant was involved in a vehicle accident; (2) the accident caused injury to someone else; (3) defendant knew or should have known the accident injured another person; and (4) defendant willfully failed to perform duties required under sections 20003 and 20004. (§ 20001, subd. (a); *People v. Rocovich* (1969) 269 Cal.App.2d 489, 492-493; CALCRIM No. 2140.)

Here, Word saw the victim crossing Florin Road southbound. A police officer directed the victim to get out of the middle of the street. Word saw a white car she believed to be a Cadillac hit the victim. She was certain it was the white car that hit the victim. The right side of the car struck the victim. She was approximately 20 feet away at the time. Word heard a loud boom and saw the victim fly into the air and then hit the ground. After the car hit the victim, it went onto Stockton Boulevard and kept going. After the collision, Word saw the mirror from the car "sitting right there."

11

Mayfield saw the victim jaywalking across Florin Road. A police officer directed the victim to get out of the street. Mayfield then heard a loud thump and saw the victim "in the air and hit the ground." Mayfield saw a white Cadillac turning the corner "[r]ight in the center of America's Tire." The Cadillac "hit the corner to take off." The Cadillac did not stop. "It just turned at the corner by the tire place and kept going." "It was driving pretty fast," and pulled off "really fast." The car turned right and crossed two lanes and continued in the furthest lane on the left. Mayfield found a car's mirror near the victim. In her 911 call, Mayfield reported that the injured victim had been hit by a white Cadillac. She also reported that the vehicle "did not stop. . . . Um, I - I - I just seen a car hit him and keep going."

Castro Arguello was in the parking lot of the tire shop at Florin Road and Stockton Boulevard when she heard a loud noise, "like a loud bang." She looked toward the street "and a car drove right -- like, right past [her] face." There was a line of cars in the street waiting to turn right, so the driver of the Cadillac "just cut over the sidewalk and through the tire shop . . . parking lot and out behind the Burger King towards Stockton." The car was "[p]robably" a Cadillac, silver or off-white, with a black convertible top. The right mirror of the car was missing. An older light-skinned African-American male wearing a white T-shirt was driving the car. Castro Arguello saw the car's right-side mirror at the scene. In her 911 call, Castro Arguello reported that the victim had been hit by a white Cadillac with a black male driving. Castro Arguello reported that the Cadillac "drove through the America's Tires and he went through the back." She also reported that there was "a piece of the car" at the scene.

Approximately one to two miles from the site of the accident, Deputy Allbee saw a white Cadillac traveling south that went straight from a turning lane at a high rate of speed. Allbee pulled in behind the white Cadillac and followed it "to try to determine what was going on with it, if it was a[n] intoxicated driver or somebody just driving reckless." The driver drove in the center, "suicide" lane for "quite a ways" amidst heavy

12

traffic. Allbee followed the Cadillac into a gas station, and, while doing so, heard a broadcast indicating a white vehicle was involved in a nearby hit-and-run accident. As he pulled into the gas station, Allbee "immediately noticed that the passenger[] side mirror had been knocked off or was missing from the" Cadillac. Allbee heard another broadcast describing the vehicle involved in the accident as a white Cadillac with a black male adult driver. Allbee described the vehicle he followed into the gas station as "a white Cadillac with a black male adult driver." Allbee learned that one of the officers at the scene of the accident described the vehicle as a white Cadillac, possibly a convertible, with a "black rag top." Allbee testified: "So the vehicle -- the base on the vehicle is white, and it has the black, I guess, cloth top . . . on the top roof of the vehicle." The passenger-side mirror was missing, the passenger-side window was down, and the wiring that would have connected into the missing mirror for a defroster or for a power-adjusting mirror was on the inside of the vehicle.

At some point, someone brought Allbee a mirror from the scene of the accident. It matched the white Cadillac. Mayfield and Castro Arguello both saw the Cadillac at the gas station. Castro Arguello identified the car as the one she had seen.

As to the first element, the evidence is sufficient to prove defendant was involved in a vehicle accident. Word saw the white Cadillac hit the victim and Mayfield and Castro Arguello heard the impact and watched the white Cadillac drive away. The mirror of defendant's car was found next to the victim. Defendant was located by Deputy Allbee minutes after the accident within one or two miles. Mayfield and Castro Arguello both saw the white Cadillac at the gas station. Castro Arguello identified the car as the one she had seen.

As to the second element, the evidence was sufficient to prove the accident caused injury to someone else. The victim was bleeding profusely from his head at the accident scene. He sustained numerous injuries, including a broken neck.

13

Defendant asserts the evidence was insufficient to establish his car was a legal cause of the victim's severe injuries. However, the prosecution was not required to prove that type of causation.

"As courts have repeatedly observed, although the Vehicle Code section 20001(a) offense is commonly referred to as a hit and run, the term is something of a misnomer; the offense is 'more accurately described as fleeing the scene of an injury accident.' " (*Martinez, supra*, 2 Cal.5th at p. 1102, quoting *People v. Valdez* (2010) 189 Cal.App.4th 82, 84 (*Valdez*).) "That is to say, ' "the act made criminal" ' under the statute ' "is not the 'hitting' but the 'running.' " ' " (*Martinez*, at p. 1102, quoting *Valdez*, at p. 87.) " ' "The legislative purpose of sections 20001 and 20003 is to prevent the driver of a vehicle involved in an injury-causing accident from leaving injured persons in distress and danger for want of medical care and from attempting to avoid possible civil or criminal liability for the accident by failing to identify oneself." ' " (*Martinez*, at p. 1102, quoting *People v. Escobar* (1991) 235 Cal.App.3d 1504, 1510.)

"Under Vehicle Code section 20001(a), '[t]he occurrence of an injury accident is a condition precedent' to the imposition of a duty to stop, provide identification, and render aid—'but [it] is not an element of the crime' in the sense that it constitutes part of the conduct forbidden by the statute." (*Martinez, supra*, 2 Cal.5th at pp. 1102-1103, quoting *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1340.) "*Nor is any degree of fault required for conviction*; a defendant who flees the scene of an injury accident has committed a crime even if the accident was solely the result of the victim's own negligence." (*Martinez*, at p. 1103, citing § 20001, subd. (a), italics added; accord, *Corenbaum*, at p. 1340 ["Many courts have concluded that the conduct made criminal by Vehicle Code section 20001, subdivision (b) is fleeing the scene of an injury accident without providing the required information or rendering assistance, rather than causing or being involved in the accident itself"].) "The duties imposed by [section 20001] are imposed upon the driver whether or not he is responsible for the accident." (*People v.*

*Bammes* (1968) 265 Cal.App.2d 626, 632 (*Bammes*), disapproved on another ground in *Byers v. Justice Court for Ukiah Judicial Dist. of Mendocino County* (1969) 71 Cal.2d 1039, 1045.) "[S]ection 20001 is not concerned with the legal liability for the *cause* of the accident but with involvement rather than liability." (*Bammes*, at p. 633.) The statute premises criminal liability on the defendant being "involved in an accident." (§ 20001, subd. (a).) " ' "[T]he word 'involved' is there used in the sense of being connected with (an accident) in a natural or logical manner." ' " (*People v. Powell* (2010) 181 Cal.App.4th 304, 318, quoting *People v. Sell* (1950) 96 Cal.App.2d 521, 523 [discussing predecessor statute].) "As the United States Supreme Court once explained in upholding [section] 20001 against constitutional challenge, 'it is not a criminal offense under California law to be a driver "involved in an accident." An accident may be the fault of others; it may occur without any driver having been at fault.' " (*Martinez*, at p. 1103, quoting *California v. Byers* (1971) 402 U.S. 424, 431 [29 L.Ed.2d 9] (plur. opn. of Burger, C.J.), italics added.)

As the Attorney General asserts, there is no requirement under section 20001 that the defendant driver cause the victim's injuries. Rather, it is only required that the defendant is "*involved*" in the accident. (§ 20001, subd. (a), italics added.) Thus, defendant's contention that the evidence is insufficient to support his conviction because it did not establish that he caused the victim's injuries is without merit.

Defendant in his reply brief asserts that his position is not that he was not a cause of the *accident*, but that he did not cause the victim's *injuries*, and that "the element not proved by sufficient evidence is that [defendant] was a legal and proximate cause of [the victim's] serious *injuries*, which most certainly is a required element of conviction." What defendant does not do is identify any statute or case law that supports his position that, to be guilty of a violation of section 20001, the prosecution must establish that the defendant caused the victim's injuries that were sustained in the accident. There would appear to be no such authority. If, as our high court has stated, no degree of fault is

15

required for conviction (*Martinez, supra*, 2 Cal.5th at p. 1103), there is no requirement that the defendant caused the victim's injuries. The purpose of the statute is, in part, to " ' "prevent the driver of a vehicle involved in an injury-causing accident from leaving injured persons in distress and danger for want of medical care . . . ." ' " (*Id*. at p. 1102.) Neither the statute nor the interpreting case law requires the defendant be the proximate cause of the victim's injuries; they merely require the defendant be "involved" in the injury accident and leave without performing the statutory duties.

Defendant does cite secondary sources for the premise that a defendant's act must be the proximate cause of injury, death, or other harm that constitutes the crime. However, the wrong addressed by section 20001 is not the accident and the immediately resulting injuries; it is the potential harm resulting from " ' "leaving injured persons in distress and danger for want of medical care . . . ." ' " (*Martinez*, at p. 1102.) " ' "[T]he act made criminal" ' under the statute ' "is not the 'hitting' but the 'running.' " ' " (*Ibid*., quoting *Valdez, supra*, 189 Cal.App.4th at p. 87.) As such, defendant's focus on whether he caused the injuries the victim sustained in the "hitting" is misplaced.

As to the third element, the evidence was sufficient to prove defendant knew or should have known the accident injured another person. "Section 20001 has long been deemed to impose a knowledge requirement which requires proof the accused knew or was aware that (1) he or she was involved in an accident and (2) the accident resulted in injury to another. As to the latter, our Supreme Court has construed section 20001 to require proof that the defendant '[knew] that the accident resulted in injury to a person or [knew] that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person.' " (*People v. Harbert* (2009) 170 Cal.App.4th 42, 45 (*Harbert*), quoting *People v. Holford* (1965) 63 Cal.2d 74, 83 (*Holford*).) "Thus, for the purposes of the substantive offense of failing to stop at the scene of an automobile accident, actual knowledge is not required. A defendant's knowledge of having been in an accident involving an injured person may be established by circumstantial evidence,

16

and a defendant's simple denial of the requisite knowledge is not determinative." (*People v. Nordberg* (2010) 189 Cal.App.4th 1228, 1238, citing *Harbert*, at pp. 53-55.)

According to the eyewitness testimony, the impact was substantial enough to send the victim into the air. Mayfield saw the victim "in the air and hit the ground." Word estimated the victim went two or three feet off the ground. The victim in fact suffered numerous injuries, including a broken neck.

The impact was also sufficient to detach the side mirror from defendant's Cadillac. The mirror was found next to the victim. Necessarily, the mirror was quite suddenly absent from defendant's car.

Additionally, given the victim was walking southbound across Florin Road, defendant was driving eastbound on Florin Road, and the impact broke defendant's passenger-side mirror off of his car, the victim was necessarily crossing directly in front of defendant's car, had just finished doing so, or otherwise was directly to the defendant's right side when defendant's car struck him.

The impact between defendant's vehicle and the victim was loud enough to make a noise that Word, Mayfield, and Castro Arguello all heard. Word, who was 20 feet away, described a "loud boom," "like something got hit." Mayfield, approximately 10 to 12 feet away, heard a loud thump. Castro Arguello heard a loud noise "like a loud bang" that caused her and both mechanics she was approaching to look to the street. Defendant, of course, was in the car and much closer to the impact than any of these witnesses.

The defense presented evidence to the effect that defendant had an upgraded sound system installed in his Cadillac. However, Mayfield did not hear any music coming from the car at the time immediately after the accident. When he approached the car shortly after the accident, Allbee did not hear music coming from the car either.

Defendant's post-impact conduct is relevant to bolster the conclusion he had knowledge of the injury causing accident. (See *Bammes, supra*, 265 Cal.App.2d at p. 634 [discussing the defendant's post-collision actions as justifying a finding she knew she had

17

been involved in the accident and that she had been a contributing cause of it].)  He left the scene, by some accounts driving very fast.  According to Castro Arguello, he cut through the tire store parking lot to avoid a line of cars waiting to turn right onto Stockton Boulevard.  When Deputy Allbee first saw defendant, minutes after the accident, he was going at a high rate of speed, faster than the flow of traffic, went straight from a right turn lane, and drove in the "suicide" lane for some time.  And when Allbee approached defendant and his vehicle at the gas station, not only was the side mirror missing, but the wiring formerly wired into the mirror was draped inside the passenger-side window.

According to defendant, his post-impact conduct was "fully consistent with innocence."  We do not agree.  Moreover, even if defendant's post-accident conduct was consistent with innocence, "[i]f the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings, supra*, 50 Cal.4th at p. 639.)

The foregoing is substantial evidence to establish defendant "knew or was aware that (1) he or she was involved in an accident and (2) the accident resulted in injury to another." (*Harbert, supra*, 170 Cal.App.4th at p. 45.)  As for the former requirement, the circumstantial evidence, including the impact, the sound, and the suddenly missing mirror, and defendant's post-impact conduct was sufficient to establish defendant knew he was in an accident.  As for the latter requirement, the foregoing constituted sufficient circumstantial evidence to establish defendant was involved in an accident " 'of such a nature that one would reasonably anticipate that it resulted in injury to a person.' " (*Ibid*., quoting *Holford, supra*, 63 Cal.2d at p. 83.)  Constructive knowledge of personal injury may be attributed to the driver of a vehicle where "the seriousness of the collision would lead a reasonable person to assume there must have been resulting injuries." (*People v. Carter* (1966) 243 Cal.App.2d 239, 241 (*Carter*), citing *Holford*, at pp. 79-80.)

18

Defendant relies on *Garabedian v. Superior Court* (1963) 59 Cal.2d 124 (*Garabedian*). The question presented in that case was "whether there was any evidence, direct or indirect, at the preliminary hearing, of an essential element or ingredient of the offense charged, to-wit, whether petitioner knew he had had an automobile accident." (*Id*. at p. 125.) The transcript from the preliminary hearing disclosed "no evidence tending to show that petitioner knew his car had been involved in an accident, if indeed it was, or that another person had been injured." (*Id*. at p. 127.) "The pedestrian appears from the evidence to have been seriously hurt. Lying on the pavement, he had blood coming out of his forehead, one eye was closed, and he complained of inability to move his arm. He was apparently removed by ambulance. [¶] There was, however, none of the damage to petitioner's car that might reasonably be expected had it caused such injuries. His car had no more than the indicated brush marks; no paint had been removed or scratched, and there were no dents or indentations of any kind. Obviously, the brush marks where the dust was cleared could have been caused in a variety of ways other than by the accident. [¶] All the evidence is to the effect that petitioner knew nothing of the accident or of his suspected involvement until the arresting officer told him about it at 5:30 in the morning, three hours later." (*Ibid*.)

Defendant's reliance on *Garabedian* is misplaced. Here, an eyewitness testified that she saw the right side of the car strike the victim. There was damage to defendant's vehicle. The passenger-side rearview mirror was detached in the accident and was found next to the victim. There is little if any question defendant's vehicle was, in some manner, "involved" in the injury causing accident. (§ 20001, subd. (a).) Additionally, each testifying eyewitness testified to the loud noise of the impact they heard and reacted to from significantly farther away from the scene than defendant.

Defendant also relies on *Carter, supra*, 243 Cal.App.2d 239, in addressing the knowledge element. However, in *Carter*, addressing constructive knowledge, the court stated: "here the personal injuries were minor and the collision was not of sufficient

19

magnitude to compel the conclusion that injuries had probably occurred. We find no basis for imputing constructive knowledge of injury in the present case." (*Id*. at p. 241.) Here, the victim suffered a broken neck and was hospitalized. This discussion from *Carter* does not apply to the circumstances here.

Finally, as to the fourth element, the evidence was sufficient to prove defendant willfully failed to perform duties required under sections 20003 and 20004. We have concluded the evidence is sufficient to establish defendant had knowledge he was involved in an injury-causing accident. Defendant did not stop or perform the duties required under sections 20003 and 20004. Instead, he drove off on Stockton Boulevard.

According to Word, the white car that hit the victim "just keeps going," turning right on Stockton Boulevard. The car did not slow down, according to Word, but instead continued traveling at about the same speed as it was traveling when it struck the victim.

According to Mayfield, the white Cadillac turned the corner "[r]ight in the center of America's Tire." The Cadillac "hit the corner to take off." The car never stopped. "It just turned at the corner by the tire place and kept going." "It was driving pretty fast," and pulled off "really fast." The car turned right and crossed two lanes and continued in the furthest lane on the left.

According to Castro Arguello, after the impact, she looked toward the street "and a car drove right -- like, right past [her] face." There was a line of cars in the street waiting to turn right, so the driver of the Cadillac "just cut over the sidewalk and through the tire shop . . . parking lot and out behind the Burger King towards Stockton." Castro Arguello did not hear any noise coming from the car; it "just zoomed right past" her.

From all of the foregoing, a reasonable juror could infer defendant willfully fled the scene and thus failed to perform duties required under sections 20003 and 20004.

Additionally, once Deputy Allbee approached defendant at the gas station, in addition to the fact that the side mirror was missing, he noticed the passenger-side window was down, and the wiring that would have connected into the missing mirror for

20

a defroster or for a power-adjusting mirror was on the inside of the vehicle. "[I]nstead of hanging on the outside of the car, the window was down and the wires were hanging on the inside panel of the passenger door." From this, a reasonable juror could infer defendant had attempted to conceal his involvement in the accident.

Relevant to one or more of the elements, defendant asserts that "[t]here was plenty of reason to cast doubt on [Word's] testimony." According to defendant, Word, the only eyewitness who testified she actually saw his car hit the victim, did not give a statement to law enforcement on the day of the accident and was contacted by the prosecution more than a year later. While there may be no statement from Word in the police report, she testified she gave a statement to someone at the scene of the accident. She testified that the officer took her name and number, and he told her that if they had any further questions, they would contact her.

Defendant also raises what he characterizes as discrepancies between Word's testimony and that of Mayfield and Castro Arguello, related to which lane his vehicle was in and whether the car accelerated after impact. However, the absence of a statement from Word in the police report and any discrepancies in the eyewitness testimony gave rise to credibility issues to be resolved by the jurors, who saw and heard the testimony. As stated *ante*, in reviewing a claim for sufficiency of the evidence, "[w]e neither reweigh the evidence nor reevaluate the credibility of witnesses." (*Jennings, supra*, 50 Cal.4th at p. 638.)

Defendant also relies on Kauderer's testimony that "it was unlikely that [the victim], after jaywalking from the left side of [defendant's] car, could only have been struck by [defendant's] passenger-side mirror on the right side without any other signs of contact with the car." However, viewing the evidence in the light most favorable to the judgment, substantial evidence does support this very conclusion. The victim was jaywalking southbound on Florin Road, which would be from left to right to cars, like defendant's, traveling eastbound on Florin. Word saw the right, passenger, side of

21

defendant's white Cadillac strike the victim. Mayfield heard the impact, saw the victim go up in the air and then hit the ground. Castro Arguello heard the impact and then saw the Cadillac cut through the tire store parking lot and proceed towards Stockton Boulevard. Mayfield saw the white Cadillac turning the corner "[r]ight in the center of America's Tire." The side mirror from defendant's car was found on the ground next to the victim. When Allbee approached defendant and his Cadillac at the gas station, he observed that the passenger-side mirror was missing, and the wires that once fed into the mirror housing were hanging inside the passenger-side window. Other than the missing mirror, Allbee did not recall any other damage to the car. Whether or not any other portion of defendant's Cadillac struck the victim, and whether or not defendant characterizes these circumstances as unlikely, this was substantial evidence that defendant's vehicle struck the victim with the passenger-side mirror as the victim jaywalked southbound on Florin Road despite the fact that there was no other evidence of damage to defendant's car.

Defendant further emphasizes Kauderer's opinion that "mere contact with the collapsible mirror could not possibly have caused [the victim] to 'fly' through the air across another lane of traffic and suffer the severe injuries that he did."

Notwithstanding Kauderer's expert testimony on this issue, the jurors necessarily concluded defendant was involved in an accident and failed to stop and perform the requisite duties. We have concluded substantial evidence supports this determination. Additionally, the jury may have been skeptical concerning Kauderer's expert opinion given he acknowledged that, in preparation for this case, while he reviewed the police report, he did not review the victim's medical records, speak to any witnesses, visit the accident scene, review photographs of the accident scene, or perform any type of reconstruction. Kauderer agreed that he "[j]ust essentially looked at the police report." Kauderer also acknowledged on cross-examination that there was no indication in the

police report of any vehicle-pedestrian impact other than that between defendant's vehicle and the victim. There was no mention of any other vehicle striking the victim.

According to defendant, the "most likely scenario is that [the victim] was struck primarily by another vehicle to the right of [defendant's] car, causing him to make incidental contact with [defendant's] passenger-side mirror after being hit." Even if this were true, a question we need not reach, defendant nonetheless was "involved" in an injury accident, giving rise to the duty to stop and fulfill the statutory requirements. (§ 20001, subd. (a).) Moreover, where, as here, "the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings, supra*, 50 Cal.4th at p. 639.)

On this record, we cannot say that " ' "it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*Penunuri, supra*, 5 Cal.5th at p. 142.) Viewing the evidence in the light most favorable to the judgment, we conclude substantial evidence supports the jury's verdict.

II

*CALCRIM No. 2140*

The trial court instructed the jury with CALCRIM No. 2140, in part, as follows: "The Defendant is charged with failing to perform a legal duty following a vehicle accident that caused injury to another person. To prove that the Defendant is guilty of this crime, the People must prove that: [¶] One: While driving, the Defendant was involved in a vehicle accident. [¶] Two: The accident caused injury to someone else. [¶] Three: The Defendant knew that he had been involved in an accident that injured another person or knew from the nature of the accident that it was probable that another person had been injured. [¶] And four: The Defendant willfully failed to perform one or more of the following duties: [¶] A: To stop immediately at the scene of the accident.

23

[¶]  B:  To provide reasonable assistance to any person injured in the accident.  [¶]  C:  To give to the person struck or any peace officer at the scene of the accident all of the following information:  [¶]  The Defendant's name and current residence address.  [¶] The registration number of the vehicle he was driving.  [¶]  And the name and current residence address of the owner of the vehicle if the Defendant is not the owner. [¶] . . . [¶]  The driver of a vehicle must perform the duties listed above regardless of who was injured and regardless of how or why the accident happened.  It does not matter if someone else caused the accident or if the accident was unavoidable."

In the trial court, defendant did not object to CALCRIM No. 2140 on the basis raised here either at the jury instruction conference or when the court read the instruction to the jury.  The Attorney General asserts defendant forfeited his contention by failing to raise it in the trial court.  Because defendant's claim is that the trial court failed to instruct sua sponte on an element of the crime—causation—we address the contention on its merits.

Defendant asserts the trial court erred by failing to instruct the jury on causation of the accident and injuries in instructing the jury with CALCRIM No. 2140.  Defendant asserts the trial court was obligated to give bracketed portions of CALCRIM No. 2140 defining causation because causation was one of the central issues raised by his defense and because it is an essential element of the crime charged.  Specifically, defendant asserts the trial court was required to instruct the jury, sua sponte, with the following bracketed language of CALCRIM No. 2140:  "[An accident causes (death/ [or] [permanent, serious] injury) if the (death/ [or] injury) is the direct, natural, and probable consequence of the accident and the (death/ [or] injury) would not have happened without the accident.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.]  [¶]  [There may be more than one cause of (death/ [or] [permanent, serious]

24

injury). An accident causes (death/ [or] injury) only if it is a substantial factor in causing the (death/ [or] injury). A substantial factor is more than a trivial or remote factor. However, it need not be the only factor that causes the (death/ [or] injury).]" (CALCRIM No. 2140.)

"A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case . . . .' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 845-846, quoting *People v. Carter* (2003) 30 Cal.4th 1166, 1219.) " 'The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 332, quoting *People v. Merritt* (2017) 2 Cal.5th 819, 824.)

Defendant emphasizes the statutory language that renders the section applicable to the "driver of a vehicle involved in an accident *resulting in injury* to a person . . ." (§ 20001, subd. (a), italics added.) From this, central to his argument, defendant continues to maintain that section 20001 "requires a causal connection between the actions of a defendant involved in an accident and the *injuries* of the victim before he is required to render assistance . . . ." According to defendant, because section 20001 requires a causal connection between the actions of a defendant involved in an accident and the injuries to the victim, by failing to instruct on causation, the court failed to instruct on an essential element of the crime.

The fatal flaw in defendant's argument is his unsupported contention that, for criminal liability to attach under section 20001, the defendant must be the proximate cause of the injuries sustained by the victim in the accident. This is simply not a requirement under the statute or interpreting case law, as fully addressed in part I of our Discussion, *ante*. We need not reproduce that discussion here. The salient inquiry with respect to causation is whether "the accident result[ed] in injury to" the victim (§ 20001, subd. (a)), not whether the defendant through his or her role in the accident proximately

25

caused injury to the victim or which vehicle (if there were others involved) proximately caused injury to the victim. Defendant's arguments on these latter points are misplaced.

The statutory language upon which defendant places so much weight does not support his position. The statute attaches potential criminal liability to the "driver of a vehicle involved in an accident . . . ." (§ 20001, subd. (a).) As the Attorney General asserts, it is the *accident*, not the driver, that must "result[] in injury to a person . . ." (*Ibid.*)

The bracketed language which defendant asserts should have been given itself does not support his argument. In discussing causation, the bracketed provisions, quoted *ante*, focus exclusively on whether "the accident" caused the victim's injuries. They do not focus at all on whether any particular driver "involved" in the accident caused the victim's injuries.

The foregoing is consistent with the purpose of the statute. As noted *ante*, " ' "the act made criminal" ' under the statute ' "is not the 'hitting' but the 'running.' " ' " (*Martinez, supra*, 2 Cal.5th at p. 1102, quoting *Valdez, supra*, 189 Cal.App.4th at p. 87.) As such, defendant's focus on whether the instructions properly addressed causation in reference to the "hitting" is misplaced.

Defendant relies on a Bench Note for CALCRIM No. 2140, which provides: "If causation is at issue, the court has a **sua sponte** duty to instruct on proximate cause. [Citation.] If the evidence indicates that there was only one cause of death or injury, the court should give the 'direct, natural, and probable' language in the first bracketed paragraph on causation. If there is evidence of multiple causes of death or injury, the court should also give the 'substantial factor' instruction in the second bracketed paragraph on causation." (Bench Notes to CALCRIM No. 2140.)

But, given the nature of liability under section 20001, in context, the causation language in the bracketed instructions and reference to it in the Bench Note do not address, for example, which, among several vehicles "involved in an accident" was the

26

proximate cause of the victim's injuries, but rather whether the accident, a wholly different cause, or both, were the proximate cause(s) of the victim's injuries. By way of example, if a victim of an accident dies several days later of a cerebral hemorrhage, the question could be whether the death was proximately caused by the accident and, depending on the facts, the causation instruction might be required. But that was not the case here.

Defendant asserts he placed causation at issue. To the extent he did, his contentions are misplaced. The prosecutor was not obligated to prove defendant caused the victim's injuries, only that the accident in which defendant was "involved" caused his injuries.

Defendant relies on *People v. Bernhardt* (1963) 222 Cal.App.2d 567. However, that case did not involve violation of section 20001 or its predecessor. It was, in relevant part, a case charging manslaughter under Penal Code section 192. As such, beyond general principles of proximate causation, it does not inform our discussion of causation under section 20001 and is certainly not "analogous" as defendant contends. For similar reasons, defendant's reliance on *People v. Cornejo* (2016) 3 Cal.App.5th 36, a case primarily involving second degree murder, attempted murder, and shooting at an inhabited dwelling, is misplaced.

The trial court did not err by failing to instruct the jury, sua sponte, with the two bracketed paragraphs in CALCRIM No. 2140 addressed to causation.

### III

### *CALCRIM No. 226*

The trial court instructed the jury with CALCRIM No. 226 as follows: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standard, setting aside any bias or prejudice

27

you may have.  [¶]  You may believe all, part, or none of any witness's testimony.  [¶] Consider the testimony of each witness and decide how much of it you believe.  [¶]  In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.  Among the factors that you may consider are:  [¶]  How well could the witness see, hear or otherwise perceive the things about which the witness testified?  [¶]  How well was the witness able to remember and describe what happened?  [¶]  What was the witness's behavior while testifying?  [¶]  Did the witness understand the questions and answer them directly?  [¶] Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case or a personal interest in how the case is decided?  [¶]  What was the witness's attitude about the case or about testifying?  [¶]  Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?  [¶]  How reasonable is the testimony when you consider all the other evidence in the case?  [¶]  Did the other evidence prove or disprove any fact about which the witness testified?  [¶]  Do not automatically reject testimony just because of inconsistencies or conflicts.  Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also two people may witness the same event, yet see or hear it differently.  [¶]  If you decide -- strike that."

Defendant interjected, "You can't read that?" but the trial court proceeded to the next instruction.

After the jury left the courtroom, the following exchange occurred:

"THE COURT:  The jurors have left the courtroom.  [¶]  [Defendant], you had a question or a concern, and I think it had to do with the Court striking the last bracketed paragraph in 226, which reads:  [¶]  [']*If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says, or if you think the witness lied about some things but told the truth about*

28

*others, you may simply accept the part that you think is true and ignore the rest.*[']  [¶]
Mr. Mack; is that correct?

"[DEFENDANT]:  I'm just wondering why that wasn't read to the jury.

"THE COURT:  The reason I didn't read that is I only read that if there is some basis to conclude that a witness deliberately lied.  It's an optional paragraph, and I don't think on the record here there's any basis to conclude that a witness deliberately lied.  [¶] Obviously if a juror doesn't believe a witness, they will discount their testimony anyway. So that's the reason.  It's not a required inclusion in 226.

"[DEFENDANT]:  But there is evidence that they did lie.  They contradict their self many a times on the record.

"THE COURT:  Contradictions are different than lies.

"[DEFENDANT]:  It is a lie.

"THE COURT:  Anyway, I have ruled that.  I am not giving that paragraph."
(Italics added.)

Defendant asserts the trial court erred by omitting the bracketed portion of CALCRIM No. 226, italicized above, permitting the jurors to disbelieve all of a witness's testimony if they found the witness was untruthful on any point.  Defendant emphasizes the importance to his case of his challenge to the credibility of prosecution witnesses, particularly Word.  He emphasizes the fact that, despite her testimony that she gave a statement to law enforcement on the day of the accident, the police report contained no statement from Word.  He also emphasizes what he characterizes as discrepancies between Word's testimony and that of Castro Arguello and Mayfield concerning the lane in which the victim was struck and the Cadillac's speed thereafter.  Defendant asserts that, in denying defendant's request for the bracketed instruction, "the court impermissibly usurped the jury's function by refusing to give the requested part of the instruction based on its own finding that all prosecution witnesses were credible!"

29

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) General instructions on witness credibility must be given sua sponte in every case. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189 (*Diaz*).) " 'We determine whether a jury instruction correctly states the law under the independent or de novo standard of review.' " (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1152 (*Jo*); accord, *People v. Posey* (2004) 32 Cal.4th 193, 218.) "The pertinent inquiry is whether the instructions as a whole fully and fairly set forth the applicable law. [Citation.] In making that determination, we assume that jurors are intelligent persons capable of understanding and correlating all jury instructions which are given and, where reasonably possible, we interpret the instructions to support the judgment." (*Jo*, at p. 1152.)

As defendant observes, the Bench Notes for CALCRIM No. 226 state, among other things, "The court has a **sua sponte** duty to instruct on factors relevant to a witness's credibility. [Citation.] Although there is no sua sponte duty to instruct on inconsistencies in testimony or a witness who lies, there is authority approving instruction on both topics," and "Give any of the final three bracketed paragraphs if relevant based on the evidence." (Bench Notes to CALCRIM No. 226.)

Defendant maintains that the omitted, bracketed portion of CALCRIM No. 226 "must be given at the request of a party when the credibility of a witness is in issue at trial, not when the judge determines for himself whether 'a witness deliberately lied.' " What defendant's formulation of when such an instruction must be given omits, or at least underemphasizes, is that there must be some sufficient evidentiary basis for giving the instruction. An instruction is not necessarily warranted just because a party requests

30

it, asserts that it is required, or claims without evidentiary support that witnesses were lying or "coached."

In *People v. Lang* (1989) 49 Cal.3d 991 (*Lang*), abrogated on another ground in *Diaz, supra*, 60 Cal.4th 1176, the California Supreme Court cited its earlier decision, *People v. Allison* (1989) 48 Cal.3d 879, 894-895, in which it approved of a "long line of intermediate appellate decisions" holding that language from CALJIC No. 2.21, an instruction with similarities to the portion of CALCRIM No. 226 at issue here, "is a correct statement of the law *and appropriately given where there is an evidentiary basis to support it*." (*Lang*, at p. 1023, italics added.) In a footnote, our high court noted that, by the time it was deciding the case, the language at issue, with minor changes, appeared in CALJIC No. 2.21.2. (*Lang*, at p. 1023 & fn. 15.) In *Lang*, our high court concluded: "There was a sufficient evidentiary basis for the instruction in this case. The jury could reasonably conclude that one or more witnesses had been willfully false in their testimony. To cite but one example, Daniel Crothers and defendant gave sharply conflicting testimony: Crothers described an incident in which defendant pointed a gun at Crothers and said, 'I'll waste any mother fucker that screws with me,' but defendant denied that the incident ever took place. Since either defendant or Crothers must necessarily have testified falsely, and the jury could have found the falsehood willful, CALJIC No. 2.21 was properly given." (*Lang*, at p. 1024.)

Similarly, in *People v. Murillo* (1996) 47 Cal.App.4th 1104 (*Murillo*), the trial court agreed to give CALJIC No. 2.21.2 but then failed to read it to the jury. (*Murillo*, at pp. 1106-1107.) The court "accept[ed] for purposes of th[e] appeal respondent's concession that 'CALJIC No. 2.21.2 must be given *if there is any evidence in the record upon which it could be based*.' " (*Murillo*, at p. 1107, italics added.) As for that evidentiary basis, the court observed: the victim's "testimony was inconsistent in significant respects, and appellant's testimony was vague and improbable. There was substantial evidence in the record to warrant instruction on a willfully false witness."

31

(*Ibid*.) Therefore, the court concluded it was error to fail to give the jury the requested instruction. (*Ibid*.)

Thus, there must be a "sufficient evidentiary basis for the instruction." (*Lang, supra*, 49 Cal.3d at p. 1024.) Defendant's asserts that certain discrepancies warranted the instruction. They are: (1) the fact that no statement by Word appeared in the police report but she claimed she gave a statement to law enforcement that day, (2) discrepancies in the witness accounts as to which lane the Cadillac was in when it struck the victim, and (3) Word's testimony that "the white Cadillac maintained the same speed after the accident," which, according to defendant, contradicted the testimony of Mayfield and Castro Arguello. Contrary to defendant's contentions, we do not see a sufficient evidentiary basis for the bracketed instruction here.

It is not disputed that Word's statement did not appear in a police report prepared in connection with the accident. However, she testified on cross-examination that she did give a statement to someone at the scene of the accident. She testified that the officer took her name and number, and he told her that if they had any further questions, they would contact her. She testified her statement should have been in the report because she did give a statement. CHP Officer Dixon testified the only witness from whom he took a statement was Castro Arguello. He testified it is common in investigations for different officers to contact different witnesses. No one testified that a statement from Word was *not* taken at the scene. This is unlike the situation described in *Lang* where either the defendant or another witness "must necessarily have testified falsely." (*Lang, supra*, 49 Cal.3d at p. 1024.) Word plainly could have given a statement to law enforcement that did not appear in the police report.

Another "contradict[ion]" defendant raises is "Word's testimony that [the victim] was struck in the right lane instead of the center lane . . . ." According to the trial testimony, when Word first saw the victim crossing Florin Road, he was in the middle of the street when the police "blurped" him. She subsequently saw a white car she believed

32

to be a Cadillac traveling in the far-right lane, and, at that time, the victim was approximately two feet from the curb. Word saw the white car hit the man, and the victim flew into the air and then hit the ground.

Mayfield initially saw the victim "[r]ight in the middle of the street." She, too, heard an officer "bleep-bleeped at" the victim. Mayfield then lost sight of the victim, but subsequently heard a loud thump and then saw the victim "in the air and hit the ground." Asked whether the victim was closer to the curb or in the middle of Florin Road, Mayfield responded, "I guess it would be closer to the curb . . . ." Mayfield did not see the vehicle hit the victim, she could not say where the victim was when he was hit, and she was "not sure when a part of that -- in or between the middle intersection of Bank of America and the tire place that exactly he was hit, because I was watching for cars myself." She first saw the white Cadillac turning the corner by the tire store.

Castro Arguello was in the tire store parking lot when she heard a loud noise, "like a loud bang." She did not see the impact. She then saw "a car drove right -- like, right past [her] face." On cross-examination, Castro Arguello testified, as to her conclusion that it was the Cadillac that hit the victim: "why somebody would drive off going at least 50 miles an hour, umm, from the middle lane and driving over the sidewalk and just leaving, it would only make sense." Defendant then asked Castro Arguello whether she had testified she did not see the vehicle in any lane, and she responded: "Correct, because I did not see the point of impact, but can -- being that the man was lying in the turning lane, I would assume that that vehicle wasn't in the turning lane, and obviously the car wouldn't drive through the turning lane while the man is laying there after he's gotten hit. [¶] So it's only an assumption that the man was coming from the middle lane and then over the sidewalk and towards Stockton Boulevard." She also testified that, when she "actually witnessed the vehicle, it was no longer on the road . . . -- like, the car could not make a right turn in the right turning lane. Therefore, it went over the sidewalk

33

and through the parking lot." According to Castro Arguello, the victim was about five feet from the sidewalk after he was struck.

These accounts do not give rise to unavoidable conflict or suggest one or more of the witnesses testified untruthfully. Word and Mayfield both saw the victim crossing the street in the middle of Florin Road. Word saw the impact and where it occurred. Mayfield and Castro Arguello did not. All three witnesses saw the victim after the accident, closer to the curb. This, too, is unlike the where one or more witnesses "must necessarily have testified falsely." (*Lang, supra*, 49 Cal.3d at p. 1024.)

A final "contradict[ion]" on which defendant relies is that Word's testimony that "the white Cadillac maintained the same speed after the accident contradicted the testimony of [Castro] Arguello and Mayfield." Word testified the Cadillac continued traveling at about the same speed after it struck the victim. Mayfield testified the Cadillac "hit the corner to take off." She heard the "tires of it, pulling off." "It was driving pretty fast," and pulled off "really fast." However, Mayfield also testified that she was not really paying attention to the Cadillac because she was worried about the victim, and that she did not see the manner in which the Cadillac was driving. Castro Arguello testified she looked toward the street upon hearing the loud bang "and a car drove right -- like, right past [her] face." Castro Arguello's testimony on cross-examination suggested the Cadillac could have been going as fast as 50 miles an hour.

Once again, this is unlike where one or more witnesses "must necessarily have testified falsely." (*Lang, supra*, 49 Cal.3d at p. 1024.) We would not characterize these matters as rising to the level contemplated in *Murillo*, where the victim's "testimony was inconsistent in significant respects." (*Murillo, supra*, 47 Cal.App.4th at p. 1107.)

We conclude there was not a "sufficient evidentiary basis for the instruction." (*Lang, supra*, 49 Cal.3d at p. 1024; accord, *Murillo, supra*, 47 Cal.App.4th at p. 1107 [accepting concession that instruction must be given if there is any evidence in the record upon which it could be based].) The trial court did not err in omitting the bracketed

34

portion of CALCRIM No. 226. There was insufficient evidence any witness deliberately lied in the case; the bracketed portion of the instruction was not supported by the evidence. The instructions as a whole fully and fairly set forth the applicable law (*Jo, supra*, 15 Cal.App.5th at p. 1152) and also accounted for minor inconsistencies in the witnesses' testimony highlighted by defendant, and there was no basis for the court to give the bracketed instruction to the jury.

IV

*Sentence*

The probation report recommended probation, with a maximum period of incarceration as a punitive measure, because defendant had an insignificant prior record of criminal conduct and expressed a willingness to abide by terms of probation. The prosecutor recommended the low term of 16 months. (§ 20001; Pen. Code, § 18, subd. (a).) The trial court sentenced defendant to the midterm of two years. The court stated: "I am going to commit you to state prison for the term of two years, the midterm rather than the low term recommended by the People. I am satisfied that the gravity of this offense and the fact that you refuse to take responsibility, despite overwhelming evidence in this case, further illuminates this in a fashion which renders it, in the Court's judgment, a midterm case rather than a low term as recommended by the People."

On appeal, defendant asserts the trial court abused its discretion in imposing the midterm sentence based on impermissible factors, particularly where the probation report recommended probation and the prosecution recommended the low term. The improper factors defendant cites are (1) the fact defendant continued to maintain his innocence and was not remorseful, and (2) the court's factually incorrect statements that the underlying accident caused the victim's death.

"Even with the broad discretion afforded a trial court under the amended sentencing scheme, its sentencing decision will be subject to review for abuse of

discretion. [Citations.] The trial court's sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.' [Citation.] As under the former scheme, a trial court will abuse its discretion under the amended scheme if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision." (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

"In exercising his or her discretion in selecting one of the three authorized terms of imprisonment referred to in [Penal Code] section 1170(b), the sentencing judge may consider circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision. The relevant circumstances may be obtained from the case record, the probation officer's report, other reports and statements properly received, statements in aggravation or mitigation, and any evidence introduced at the sentencing hearing." (Cal. Rules of Court, rule 4.420(b).)

We address first the court's consideration of the fact that defendant continued to maintain his innocence and was not remorseful. With regard to the denial of probation, as defendant acknowledges, the sentencing court is authorized by statute to consider, as a criterion affecting probation, "[w]hether the defendant is remorseful." (Cal. Rules of Court, rule 4.414(b)(7).) Therefore, as to the denial of probation, the trial court did not abuse its discretion in considering defendant's lack of remorse.

As for imposition of the midterm sentence rather than the low term, defendant relies on *People v. Key* (1984) 153 Cal.App.3d 888 (*Key*), in which the court stated: "lack of remorse is not a valid reason to aggravate a sentence because Key denies committing the crimes. Lack of remorse is not specifically designated as a relevant aggravating factor in California Rules of Court, rule 421, but is listed as a criterion affecting probation in rule 414(d)(9). Where a defendant acknowledges guilt, but shows no remorse, he may be expected to repeat the criminal conduct under similar

36

circumstances.  [Citation.]  In such a case, lack of remorse may be applied to aggravate as an additional relevant factor pursuant to rule 408.  However, here the evidence of nonconsensual intercourse consists primarily of the sharply conflicting testimony of Key and the prosecuting witness.  The evidence of guilt is not overwhelming and Key steadfastly denies the rapes.  Under these circumstances, Key's lack of sorrow does not indicate he is likely to engage in future sexual attacks."  (*Id*. at pp. 900-901.)

Elsewhere, courts have stated:  "[l]ack of remorse can be used to aggravate a sentence ' "unless the defendant has denied guilt *and* the evidence of guilt is conflicting." ' "  (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1064, fn. 7 (*Weber*), quoting *People v. Leung* (1992) 5 Cal.App.4th 482, 507 (*Leung*).)

Defendant's reliance on this line of cases is misplaced.  Here, defendant has steadfastly denied his guilt.  However, the trial court expressly concluded this was "a midterm case rather than a low term" case based on, among other things, "the gravity of this offense *and the fact that you refuse to take responsibility, despite overwhelming evidence in this case . . . .*"  (Italics added.)  In contrast to *Key*, and contrary to defendant's contentions, we agree with the trial court that the evidence of defendant's guilt, marshalled repeatedly *ante*, was overwhelming.  (See *Key, supra*, 153 Cal.App.3d at pp. 900-901.)

Additionally, we would not characterize the evidence of guilt as conflicting.  (See generally *Weber, supra*, 217 Cal.App.4th at p. 1064, fn. 7; *Leung, supra*, 5 Cal.App.4th at p. 507.)  Other than attacking the prosecution witnesses' credibility, attacks the jury necessarily rejected, the defense was premised on defense expert Kauderer's testimony.  Kauderer expressed doubt about whether a car's exterior rearview mirror would be the only part of a vehicle to strike a pedestrian, and observed there was no indication that any other part of defendant's car struck the victim.  He also expressed skepticism as to whether being struck by a car's mirror could send a pedestrian flying into the air.  However, Kauderer also acknowledged that, in preparing to testify, he only reviewed the

police report and paper discovery. He did not review the victim's medical records. He did not speak to any witnesses. He did not visit the accident scene, see photographs of the accident scene, or perform any accident reconstruction. He did not inspect defendant's vehicle. Kauderer agreed that he "[j]ust essentially looked at the police report." Kauderer also acknowledged there was no indication in the police report of any vehicle-pedestrian impact other than that between defendant's vehicle and the victim.

More significantly, asked by the prosecutor if he was testifying that defendant's car did not hit the victim, Kauderer responded: "I am saying there is doubt that it was the Defendant's car, yes, based on the -- where the officer said the impact took place and the description of the witness as to how the body was projected through the air, I definitely think there's doubt that [defendant's] -- *only* [defendant's] rearview mirror hit the pedestrian. Yes, I think there is doubt about that." (Italics added.) He subsequently testified, "I would say that the limited materials that I reviewed put into question, again for the reasons that I have explained numerous times, that it *only* was [defendant's] car . . . ." (Italics added.) Even accepting Kauderer's testimony, to be guilty of a violation of section 20001, the prosecution was not required to prove defendant was at fault in the causing of the accident, that there were no other vehicles involved, or that *only* defendant's vehicle struck the victim. (*Martinez, supra*, 2 Cal.5th at p. 1103 [" '[a]n accident may be the fault of others; it may occur without any driver having been at fault' "].) Thus, Kauderer's skepticism about whether the victim was hit "only" by defendant's car does not create a conflict in the evidence as to whether defendant was guilty of violation of section 20001.

Because the evidence of defendant's guilt was overwhelming (see *Key, supra*, 153 Cal.App.3d at pp. 900-901) and the evidence of guilt was not conflicting (see *Weber, supra*, 217 Cal.App.4th at p. 1064, fn. 7; *Leung, supra*, 5 Cal.App.4th at p. 507), the trial court's consideration of defendant's failure to accept responsibility and lack of remorse was not an abuse of discretion.

38

A single aggravating factor is sufficient to support a midterm sentence. (See *Weber, supra*, 217 Cal.App.4th at p. 1064, citing *People v. Osband* (1996) 13 Cal.4th 622, 728 ["[a] single aggravating factor will support an upper term sentence"].) Thus, the trial court's proper reliance on this factor establishes the court did not abuse its discretion in sentencing defendant.

In any event, we turn to the trial court's statements concerning the victim's death. By way of background, the victim died before trial. The trial court granted the prosecution's in limine motion to admit the victim's death certificate to explain why the victim would not be available to testify. In arguing in limine motions, the prosecutor represented that the death certificate would be admitted "because it explains why [the victim] will not be available to testify. It doesn't -- it's not going to be discussed beyond the fact he's unavailable because he has passed away. And I have no issue with sanitizing it to explain that it was not as a direct result of this incident, but that he passed away after this incident from something unrelated." Subsequently, the prosecutor again stated that he would just indicate the victim died not as a result of the incident, and that there was no connection between the incident and the victim's death. Ultimately, defendant declined to stipulate, and the court admitted the victim's death certificate into evidence.

As sentencing commenced, the trial court stated that the matter "was tried to a jury, and [defendant] was found guilty of 20001(a), hit-and-run, in which the victim suffered his death." However, the prosecutor subsequently stated, "the victim in this case was seriously injured, initially breaking his neck, and then later dying. That isn't a direct result of this incident, but they did suffer their death shortly after this incident, and it was because of a hospitalization because of this." When defendant asserted later in the sentencing proceedings that he was wrongfully convicted and the evidence did not establish his guilt, the trial court responded: "you were convicted. You did commit the crime. The person was hit. You hit the person. He died."

39

Defendant maintains the trial court abused its discretion in relying on the victim's death in imposing the midterm sentence when the parties agreed during trial that the victim's death was not caused by the accident. According to defendant, the trial court relied on incorrect and unreliable information.

Defendant relies on *People v. Eckley* (2004) 123 Cal.App.4th 1072 (*Eckley*), in which the court stated, " 'Reliability of the information considered by the court is the key issue in determining fundamental fairness' " in the context of a sentencing or probation hearing. (*Id*. at p. 1080.) "A court's reliance, in its sentencing and probation decisions, on factually erroneous sentencing reports or other incorrect or unreliable information can constitute a denial of due process." (*Ibid*.)

However, defendant has not established that the trial court relied on "erroneous sentencing reports or other incorrect or unreliable information" in sentencing him. (*Eckley, supra*, 123 Cal.App.4th at p. 1080.) It is not at all clear from the trial court's two offhand, factual remarks that the victim died that the court concluded defendant caused the victim's death and considered this as a factor in sentencing defendant. As stated *ante*, the prosecutor at sentencing expressly pointed out that the victim's death was not "a direct result of this incident . . . ." As the Attorney General notes, "at no point did [the trial court] state that [defendant] caused [the victim's] death."

In his reply brief, responding to the Attorney General's position that the trial court did not necessarily conclude defendant's crime directly resulted in the victim's death, defendant notes that the trial court "cited 'the gravity of this offense' as an aggravating factor justifying the two-year prison term." The gravity of the offense was an aggravating factor cited in the probation report, which noted the "crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." (Cal. Rules of Court, rule 4.421(a)(1).) The trial court's consideration of the gravity of the offense, where defendant was convicted of being involved in an accident in which the 74-year-old victim suffered a

broken neck and defendant left the scene, does not mean, under the circumstances of this case, that the court considered the victim's subsequent death as a sentencing factor.

We conclude the record does not establish the trial court in sentencing defendant abused its discretion or relied on "factually erroneous sentencing reports or other incorrect or unreliable information" in sentencing him. (*Eckley, supra*, 123 Cal.App.4th at p. 1080.)

DISPOSITION

The judgment is affirmed.

                                              _____

                                              HULL, Acting P. J.

We concur:

_____

MAURO, J.

_____

KRAUSE, J.