[No. F042343. Fifth Dist. Nov. 2, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
JEANETTE ECKLEY, Defendant and Appellant.

Counsel

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Lloyd G. Carter and Brian Alvarez, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

WISEMAN, Acting P. J.—Defendant Jeanette Eckley was convicted of one count of felony child abuse and one count of misdemeanor child abuse. The court denied probation and sentenced her to the middle term of four years' imprisonment on the felony charge and a concurrent six-month term on the misdemeanor charge. We conclude that the court's reliance on sentencing documents (a probation report, two psychological reports, and a letter from a prison administrator) containing material factual misstatements necessitates a remand for a new probation and sentencing hearing.

## *FACTUAL AND PROCEDURAL HISTORIES*

Defendant is a single mother of five children. Before her arrest, she was employed as a social worker at Kern County Child Protective Services. The chain of events leading to her arrest began one day when she was having trouble controlling the behavior of her nine-year-old son. As she had done on previous occasions, defendant became upset and struck him with her hand, hitting his face three times, causing bruises.

A few days later, while the son still had bruises on his face, defendant bought the children some sandwiches from a sandwich shop. An employee dropped a dirty mayonnaise jar into one of the sandwiches as she was making it. The children did not eat all of the sandwiches, and defendant kept the remaining ones in the refrigerator until the next day when the son and defendant's five-year-old daughter ate them. That afternoon, about 3:00, the nine-year-old son and five-year-old daughter complained of nausea.

Defendant suspected food poisoning. She attempted to alleviate it by giving the children syrup of ipecac to induce vomiting. As expected, the children began to vomit. Defendant then left the house for two and one-half hours to pick up costumes for a play or rehearsal at the Bakersfield Community Theater in which some of the children were to participate that

night. Then, taking the other children with her, she left the nine-year-old alone in the house and went to the theater. At the theater, the five-year-old began vomiting again. Defendant took the children home and found that the nine-year-old was also still sick.

Defendant got the two sick children ready for bed. She gave each of them a shower. The boy sustained two chipped teeth during his shower. Defendant claimed that because of a problem with her depth perception, she accidentally hit him in the mouth with a scrub brush.

At 10:00, about an hour after the two children went to bed, defendant woke them up to give them a drink because she was concerned that the vomiting could dehydrate them. She continued trying to give them fluids through the night, but they continued vomiting.

About 3:00 or 3:30 in the morning, the boy woke up and had a seizure. His eyes rolled back, and he was rigid and shaking. After he recovered, he complained of pain in his legs. Defendant gave him some liquid acetaminophen. She also gave some to the girl. Both children vomited after swallowing the acetaminophen. The children continued to wake up and vomit occasionally for the next hour or so. About 4:00 a.m., the girl had a seizure similar to the boy's. Defendant testified that she was concerned after this "because [she] didn't feel like [the girl] came out of it a hundred percent. She was real woozy . . . ." Even so, defendant did not decide to seek medical attention because the boy "had come out of his . . . ." Instead, she sent one or more of her older children out on their bicycles to get some Pepto-Bismol. She gave the Pepto-Bismol to the two sick children. Both vomited.

During the night, defendant called her brother in Fresno and asked him to come to Bakersfield to help her with the children. When he arrived about 5:30 a.m., defendant decided to take the girl to a hospital emergency room because "there was something about [her] that I just wasn't comfortable" with. Defendant also testified that she did not take the boy to the hospital because she thought he had recovered. A police officer, a police detective, and a child protective services investigator each testified that defendant said she did not take the boy to the hospital at this time because she was afraid she would be accused of child abuse on account of his bruises. Defendant denied having said this. Her brother confirmed it in part, however, saying defendant said she was concerned that the doctors at the hospital would think she had inflicted the bruises. The officer also testified that defendant said she planned to observe the treatment given to the girl and replicate it at home with the boy, and defendant confirmed this fact.

When the girl was brought into the emergency room, the doctor who treated her observed that she appeared "very ill," moaning and rolling around

on the gurney. He was especially concerned about her mental status, i.e., her failure to wake up and be responsive. The doctor sedated her and performed a CT scan of her brain. The scan revealed no abnormality, and the doctor never learned what had caused the girl's nonresponsiveness. The girl had an elevated respiration rate and was mildly dehydrated. She also had low sodium in her blood, indicating fluid loss, probably caused by the vomiting. There was no record of her vomiting while in the emergency room, but she might have had "some small seizure activity" there. The girl recovered the next day.

While at the hospital with the girl, defendant called her brother at her apartment to check on the boy. She told him she needed more time before seeking medical assistance for the boy and wanted to see if she "could handle it." Later, she returned home, found that the boy "didn't look right," and decided to call 911 for an ambulance. At the same time, she sent her other children to Fresno with her brother.

Shortly after 10:00 a.m., the fire department was dispatched as the first responder to defendant's 911 call. When the firefighters arrived, defendant was at the curb holding the boy, who appeared to be having a seizure. The firefighters observed bruises on the boy's face, arms and back, and questioned defendant about them. She refused to answer and would not allow the firefighters to enter the apartment. Consequently, the firefighters called in the police. Meanwhile, the ambulance arrived to take the boy to a hospital.

When the police arrived, defendant refused to answer their questions about how the boy got the bruises and about where her other children were or who was caring for them. Defendant testified that she refused to give information about where her other children were because she wanted to allow time for her brother to establish the children in his home. She knew that child protective services would investigate and would be more likely to leave the children in her brother's home if they were already established. Although defendant initially refused to let the police enter the apartment, she later relented.

In the emergency room, the boy was found to be agitated and nonresponsive. Like the girl, he was intubated, sedated, and given a CT scan of his brain, which was normal. Like the girl, he had low blood sodium and was "somewhat dehydrated." He had no seizures while in the emergency room. As with the girl, the doctor never determined the cause of the boy's illness and he recovered the next day.

Both of the emergency room doctors who treated the children opined that a patient having seizures and severe vomiting is in danger of aspirating vomit, which in turn can cause pneumonia or death by asphyxiation. A third doctor, acting as an expert for the prosecution, later evaluated the children's medical

records and expressed the same opinion. He stated that the girl's records showed that she had, in fact, aspirated some vomit. This doctor also offered the "theory" that the children's vomiting was caused by a combination of food poisoning and syrup of ipecac. The vomiting in turn caused an electrolyte imbalance, and the electrolyte imbalance caused the seizures. Accidental ingestion of a dog deworming drug that was in the apartment could also have been a cause of the children's condition. Finally, this doctor opined that, while the length of time between the children's seizures and defendant's taking them to the hospital was "a little concerning" and "a little worrisome" on account of dangers like asphyxiation, both children got to the hospital in time to get the proper treatment.

The district attorney filed an information charging felony child abuse (Pen. Code, § 273a, subd. (a)) of the boy and girl. In his closing argument, the prosecutor told the jury it could convict as to both children on a theory of indirect abuse based on defendant's delay in seeking medical assistance. He told the jury that it also could convict as to the boy on an alternative theory of direct abuse, based on defendant's hitting him. The court instructed the jury that it must unanimously choose one theory in order to convict with respect to the boy but need not specify in its verdict which theory it chose.

The jury found defendant guilty as charged for abuse of the boy and found her guilty of the lesser-included offense of misdemeanor child abuse (Pen. Code, § 273a, subd. (b)) as to the girl. The court denied probation and sentenced defendant to the middle term of four years' imprisonment for the felony and a concurrent term of six months for the misdemeanor.

## *DISCUSSION*

Defendant argues that several documents the court considered in denying probation and imposing sentence were based on police reports and contained material factual statements that were shown to be false by the trial evidence. Defendant contends this was an abuse of discretion and a denial of due process of law. She requests that we vacate the sentence and the order denying probation and remand for a new probation and sentencing hearing.

The People argue, as a threshold matter, that defendant's due process claim has not been preserved for appeal. We disagree. Before the sentencing hearing, defendant filed a statement in mitigation. The statement objects to the same inconsistencies between the sentencing documents and the trial evidence that defendant relies on now. Defendant repeated this objection at the sentencing hearing. Defendant did not use the words "due process" in the

memorandum or at the hearing, but we do not think that was required to preserve the issue. The cases the People rely on, *People v. Saunders* (1993) 5 Cal.4th 580, 590 [20 Cal.Rptr.2d 638, 853 P.2d 1093] and *In re Josue S.* (1999) 72 Cal.App.4th 168, 170 [84 Cal.Rptr.2d 796], state the rule that an objection to a sentencing or probation decision is waived if not raised in the trial court, but they do not require the objection to be made with more specificity than appears in the record here. We proceed to consider the merits of the issue.

Correctional authorities submitted four documents to the court for sentencing purposes: 1) the probation officer's report (probation report); 2) a diagnostic evaluation by staff counselors at Valley State Prison for Women (diagnostic evaluation); 3) a psychological evaluation by experts for the California Department of Corrections (psychological evaluation); and 4) a cover letter, attached to the diagnostic evaluation and psychological evaluation, by Associate Warden T. Hornbeak of Valley State Prison for Women (cover letter). The last three of these documents were created pursuant to Penal Code section 1203.03 at the joint request of the parties. The court stated at the hearing that it had read and considered them.

The probation report states that it is based on police reports and a report by the Kern County Department of Human Services. Although the sentencing hearing was held on January 23, 2003, almost six months after the jury returned its verdict, the probation report was prepared on August 26, 2002—just a few weeks after the trial—and the author "did not have access to" the trial transcript. The diagnostic evaluation is based on the probation report. It is not clear what documents the authors of the psychological evaluation examined, but that report also appears to rely on the probation report and not on any trial evidence. The cover letter is based on the two evaluations.

Defendant points to several passages in the reports. First, after a description of the arrival of firefighters and police officers at defendant's house, the probation report contains the following two paragraphs:

"Officers contacted the doctor who was treating [the girl]. He said she had retinal bleeding in her right eye, pneumonia, and seizures, all of which could be attributed to the vomiting which caused dehydration. He said if a large amount of ipecac was given, it would cause uncontrollable vomiting. [The girl] was semiconscious, severely dehydrated, had a low level of electrolytes in her symptoms [*sic*] and the doctor said, 'Her situation is life-threatening.'

"[The boy's] condition was checked at another hospital, where he was in the emergency room in critical but stable condition."

Many of the statements in these paragraphs were unsupported by any evidence at trial. Some were contradicted by evidence at trial. The medical testimony was that both children were moderately dehydrated—not severely dehydrated. No doctor testified that either child was ever in critical condition. Most important, none of the doctors who testified indicated that either child was in a situation that was life-threatening. The testimony supported the proposition that, before they were hospitalized, the children were at risk of choking on their vomit. But that is far different from the probation report's assertion that, as she lay in the hospital, the girl was in a life-threatening situation.

The statement that the girl was in a life-threatening situation at the hospital was not only repeated but embellished in the cover letter. According to the cover letter, "[o]nly when [defendant] learned that her daughter's illness was life threatening did she call in help for her son." This statement is not supported by the statement in the probation report (itself unsupported) from which it is derived. The probation report says that the officers were told the girl's life was in danger *after* defendant called the ambulance—not that defendant learned this and only called the ambulance afterward.

The diagnostic evaluation embellishes even more, asserting that defendant refused to seek medical assistance for the boy even though she was told that the daughter's life was in danger: "Most disturbing, however, is the callous response to her son's illness. As noted in the [probation report], Inmate Eckley's daughter was displaying symptoms similar to those exhibited by her son. The doctor described the daughter's condition as life-threatening. Regardless, Inmate Eckley refused to take her son to the hospital because of her own fear of possibly being arrested should the doctors observe the bruising on her son. She blatantly placed her own welfare before the safety of her child which may have resulted in his death."

Here, the unsupported claim that a police officer was told the daughter's life was in danger after defendant called the ambulance for her son is transmuted into proof that defendant refused to seek help for her son even though she knew he might die.

The psychological evaluation contains an accusation that in her interview with the evaluators, defendant lied about her son's chipped teeth: "[Defendant] further stated [in the interview] that her son's 'two chipped teeth' were not the result of a physical assault but occurred when bathing her 9-year-old, during which time she 'accidentally struck him in the mouth with the handle of a scrub brush.' This statement contradicts the probation report, which

states that while giving her son a shower '. . . [the son] fell down and chipped two of his teeth and bit his tongue.' [¶] . . . [¶] [Defendant] seemed to fabricate details surrounding her offense. For example, her explanation regarding her son's chipped front teeth [was] completely contradictory from her statements set forth in the probation report ('I accidentally struck him. . . .' *versus* 'he fell. . . .')."

These assertions are based on a misunderstanding of the probation report. While it does say that the boy's teeth were broken when he fell down in the shower, it does not attribute this version of events to defendant or any other specific informant. At trial, one of defendant's other children testified to his belief that the nine-year-old broke his teeth by falling in the shower. Defendant, however, testified that she accidentally struck him with a scrub brush, just as she said in the interview with the psychological evaluators.

■ Although not all the procedural safeguards required at trial also apply in a sentencing or probation hearing, such a hearing violates due process if it is fundamentally unfair. (*People v. Peterson* (1973) 9 Cal.3d 717, 726 [108 Cal.Rptr. 835, 511 P.2d 1187].) "Reliability of the information considered by the court is the key issue in determining fundamental fairness" in this context. (*People v. Arbuckle* (1978) 22 Cal.3d 749, 754–755 [150 Cal.Rptr. 778, 587 P.2d 220].) A court's reliance, in its sentencing and probation decisions, on factually erroneous sentencing reports or other incorrect or unreliable information can constitute a denial of due process. In *Townsend v. Burke* (1948) 334 U.S. 736, 741 [92 L.Ed. 1690, 68 S.Ct. 1252], a defendant "was sentenced on the basis of assumptions concerning his criminal record which were materially untrue." This was "inconsistent with due process of law" and required reversal.

In *United States v. Weston* (9th Cir. 1971) 448 F.2d 626, the defendant was convicted of possession of heroin. (*Id.* at p. 627.) A presentence report alleged that the defendant was not any ordinary offender, but was the chief supplier of heroin to western Washington State. (*Id.* at p. 628.) On this basis, the trial court imposed a 20-year sentence. (*Id.* at p. 630.) The court of appeals concluded that the factual basis for this allegation was "almost nil." (*Id.* at p. 633.) It vacated the sentence and remanded for resentencing, explaining as follows: "In Townsend v. Burke, *supra*, the Supreme Court made it clear that a sentence cannot be predicated on false information. We extend it but little in holding that a sentence cannot be predicated on information of so little value as that here involved. A rational penal system

must have some concern for the probable accuracy of the informational inputs in the sentencing process." (*United States v. Weston, supra*, 448 F.2d at p. 634.)

A number of other cases reach similar results. (See, e.g., *United States v. Tucker* (1972) 404 U.S. 443, 448–449 [30 L.Ed.2d 592, 92 S.Ct. 589] [sentence based in part on prior convictions vacated and remanded where trial court did not know that prior convictions were obtained in violation of right to representation by counsel]; *U.S. v. Safirstein* (9th Cir. 1987) 827 F.2d 1380, 1387 [sentence based on material inferences and assumptions that are unreasonable and unsupported by the record violates due process and must be vacated and remanded].)

■ We conclude that the inaccuracies in the four sentencing documents require that the sentence and denial of probation be vacated. The case is remanded for a new probation and sentencing hearing at which the court will not consider the challenged passages. The People do not deny the passages are factually incorrect and material. Further, they do not argue that due process was satisfied in spite of the material inaccuracies. The People's only argument on the merits is that the court could not have relied on inaccurate information because it struck inaccurate information from the probation report at defendant's request. But the record shows that the stricken portions have nothing to do with the inaccuracies defendant has pointed out in this appeal. The People thus have all but conceded the essential points on this issue.

Even if the People had not made these implicit concessions, we would hold that vacatur and remand are necessary. The passages quoted above exaggerated defendant's callousness. In announcing its probation and sentencing decisions, the court emphasized defendant's callousness. We vacate the sentence and the order denying probation and remand for a new hearing to ensure that these material inaccuracies do not affect the result.

Because of this ruling, we need not address defendant's argument that the court abused its discretion in its consideration of aggravating and mitigation circumstances in other respects.

## *DISPOSITION*

The sentence and denial of probation are vacated, and the case is remanded for a new probation and sentencing hearing. The judgment is affirmed in all other respects.

Levy, J., and Gomes, J., concurred.