Filed 3/23/22  P. v. Lee CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C090887 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE008675) |
| v. | |
| NHI LEE, | |
| Defendant and Appellant. | |

Defendant Nhi Lee's eight-year-old daughter H. told defendant's two sisters, A.L. and J.L., that defendant had molested her; she told them after A.L. told H. she had been molested by defendant.  This exchange took place after A.L. and J.L. told each other about having been molested by defendant in the past.  Defendant was subsequently convicted of four counts of lewd and lascivious acts on a child under the age of 14 (Pen.

1

Code, § 288, subd. (a))[1] following a six-day jury trial. He was sentenced to a 12-year state prison term.

Defendant contends on appeal: (1) it was an abuse of discretion and violation of his due process right to a fair trial to admit evidence of the sexual misconduct against his sisters pursuant to Evidence Code section 1108; (2) the Child Sexual Abuse Accommodation Syndrome (CSAAS) expert gave improper profile testimony; (3) trial counsel was ineffective in failing to seek redaction of portions of his police interview; (4) cumulative error warrants reversal; and (5) the sentence should be reversed and remanded for resentencing because the trial court drew materially false conclusions from the section 288.1 report.

It was within the trial court's discretion and no due process violation to admit the prior misconduct evidence even though the alleged acts took place 14 to 16 years before the charged crimes. The prior acts were similar to the charged offenses, as they involved sex crimes against children who were members of defendant's immediate family, and they were not prejudicial in the context of the charged offenses. The alleged profile testimony was not objected to and therefore forfeited. The failure to object to the CSAAS testimony was not ineffective as the expert did not give profile evidence. Counsel had a valid tactical reason not to object to the police officer's statements during questioning in which she accused defendant of molesting H.; such statements gave necessary context to defendant's denials and claims of innocence made during the questioning. Finding no cumulative error and no improprieties at sentencing, we shall affirm.

---

[1] Undesignated statutory references are to the Penal Code.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

*A. The Crimes*

H. was 10 years old at the time of the trial; she was living with her mother, stepfather, and their family after having lived with defendant, her brother, and various members of defendant's extended family in a house in Sacramento. When living with defendant, she slept in the same bed as him while her Uncle Ger slept in another bed in the same room. Her older brother A. used to sleep in the same bed as H. and defendant until he got too big and moved to a bed in the hallway. H. sometimes slept on a living room couch when defendant was not home; when defendant was home, she had to sleep with him.

Defendant molested her on five or six occasions by turning her over so H.'s back was against defendant's body and then putting his penis on her butt. She and defendant wore shorts and shirts. Defendant put his penis in the crack of her butt, but it never reached her anus Defendant's penis felt "floppy" and never felt "straight." She would try to squirm away, but defendant held on tight to prevent H. from moving. H. could not free herself until defendant fell asleep.

H. did not like what defendant did to her, but she never complained to him and was afraid to tell anyone. She still loved her father and did not want him to get in trouble with the police.

On March 9, 2018, H. and a cousin went with A.L. to visit J.L. in Redding. While they were in the living room talking about family problems, A.L. told J.L. that defendant had molested her about 12 years ago when she was six years old. This led J.L. to ask H. if anyone ever touched her private parts; H. started to cry and said defendant held her down when they were in bed, and she felt his penis half-way in her butt. When J.L. told H. she was going to have to tell Child Protective Services, H. replied, "you're not going to tell my dad, are you?"

3

In an interview two days later, H. told a Sacramento County sheriff's deputy that, about a year prior, defendant rolled her over in bed and put his private part in her butt. H. told defendant to stop but he did not. He kept doing this until he fell asleep. Defendant did this to her between five and 10 times; she was now a little afraid of him. At times during the interview H. would cover her mouth, close her eyes, and start to sob.

J.L. made a pretext call to defendant on the day H. was interviewed. Defendant denied molesting H. and repeatedly challenged J.L. to have H. examined to show he was telling the truth. Defendant explained he would put his arm around his daughter when it was cold, cuddling her as they fell asleep together. When asked if he had an erection during this, defendant said: "Who knows? Like say, I was sleepin'. If she felt it then I probably was erected. I don't know."

H. had a Special Assault Forensic Examination (SAFE) interview on March 28, 2018. H. told the interviewer that every time she got into bed with defendant, he would scoot towards her and told her not to fall into the space between the bed and the closet. Some nights defendant would turn her so H.'s back was against his body. She felt his "private" pressing against the crack in her butt. Defendant left his penis there until he fell asleep, after which she would move away from him. They both wore clothes; she could feel his private pushing towards her anus, and it felt "straight." H. would sometimes ask defendant to loosen his grip because she could not breathe. Defendant held her this way about six times, from when she just turned eight to right before she turned nine years old. Defendant would not let H. sleep on the couch when she asked. She was afraid defendant would keep doing this to her if she went back to live with him.

After H. started living with her mother, she made a video on her brother's cell phone saying her allegations that defendant molested her were all fake. She made the video because she wanted it all to go away and to go home with her father. What she said in the video was false; defendant did what she reported.

4

Defendant was interviewed by Sacramento County Sheriff's Detective Kelly Hodges on April 13, 2018. Defendant told the detective he had been legally separated from his wife for about eight years and had custody of their two children. He shared his bedroom with his younger brother, who slept in a separate bed. H. slept with defendant in his bed about 60 percent of the time, and with her grandmother in another room the rest of the time. When defendant and H. sleep together, she cuddles defendant's arm while he lies on his back. Defendant never pressed his body against H.'s back and never put his penis on her. If he pressed his body against H. defendant did so when he was sleeping. He did not think he got an erection when sleeping and did not believe H. felt his penis get hard. Defendant did not know what happened and would have told Detective Hodges had he known. Defendant said H. could be manipulated and bribed by his sisters but did not accuse his sisters of manipulating H. into making false allegations. He also denied molesting J.L. or A.L.

*B. Prior Misconduct*

A.L. was 21 years old at the time of the trial and 11 years younger than defendant, her brother. When she was six or seven years old and living with her family in Rancho Cordova, defendant took her to his bedroom and put his penis in her on more than two occasions. She did not tell anyone in her family because in Hmong culture, men are dominant and what they say goes. Had she told her family nothing would be done, as all problems were addressed in men-only clan meetings without notifying the police.

A.L. first disclosed the assaults to J.L. when she visited J.L. at her home in Redding in March 2018. J.L. then told A.L. that defendant had also molested her when she was much younger. J.L. wanted to see if defendant molested H.; they called her to the room where J.L. questioned H. after A.L. left the room. A.L. never told H. what defendant had done to her.

Defendant's sister J.L. was 30 years old at the time of the trial, and two years younger than defendant. Women do not have a voice in the male-dominated Hmong

5

culture. She had seen female cousins get abused and the family does nothing to stop it. The family also took no steps to protect her from a "creepy" brother-in-law who preyed on her.

When she was around 13 years old and living with the family in Rancho Cordova, defendant would run his hand along her breasts and buttocks, and then towards her vagina while she slept on the living room couch. This happened at least 10 times over one to two years. J.L. told no family members until telling her two other sisters about the incidents two to three years ago. She did not tell A.L. about the abuse until the March 2018 visit.

J.L. became concerned about H. after A.L. described how she had been abused by defendant. When J.L. asked H. whether anyone had touched her private parts, H. broke down and cried. H. then told J.L. that defendant molested her.

Defendant also denied molesting J.L. and A.L. during the pretext call. Defendant said that he used to sleepwalk and may have done something unintentionally. Pressed by J.L., defendant responded, "we were kids. That was the past."

*C. CSAAS*

Clinical psychologist Dr. Anna Washington testified as an expert on CSAAS. CSAAS has five components: (1) secrecy; (2) helplessness and entrapment; (3) accommodation; (4) delayed, unconvincing and conflicted disclosure; and (5) retraction. Without objection, she testified regarding some foundational elements of the typical sexually abusive relationship.

A majority of the child sexual abusers are male, and a majority of the victims are female. Perpetrators establish a positive or trusting relationship with the child in order to ensure secrecy. The perpetrators tend to be someone in the child's "circle of trust," like a caregiver, family acquaintance, or coach. Abuse usually starts with ambiguous touching before progressing to overt sexual contact, including intercourse. This is known as grooming, gradually preparing a child to go along with the abuse. Since victims often

6

love the perpetrators, they keep the abuse secret due to fear of losing the abuser or causing family turmoil.

Secrecy is often associated with a child feeling helpless to prevent the abuse, as the child cannot imagine life without that person. Accommodation occurs when the child feels trapped in a sexually abusive relationship; the child may disassociate as a coping mechanism. Secrecy, entrapment, and accommodation often result in delayed or partial disclosure of the abuse. Delay is more common when a family member is the abuser, as other family members often will refuse to believe the child. A child may retract or minimize an accusation if he or she senses negative consequences from the disclosure.

CSAAS is not an actual syndrome or diagnosis; it uses clinical research to describes patterns common to many child abuse victims. Whether a child has been abused is a matter for a jury to determine and is not something to be diagnosed by a mental health professional.

Dr. Washington never met the victim, does not know her name, and knew nothing about the case other than she was a female.

*Defense Evidence*

Dr. Dan Field testified as an expert on the link between cardiovascular health and erections. A man with normal physiology will have several spontaneous erections when sleeping. This is called nocturnal penile tumescence.

DISCUSSION

I

*Uncharged Sexual Misconduct Evidence*

Defendant moved pretrial to exclude the uncharged sexual misconduct evidence concerning the incidents where defendant molested J.L. and A.L., arguing the evidence should be excluded pursuant to Evidence Code section 352. The trial court denied the motion, finding the offenses were particularly probative in terms of defendant's inclination to engage in sexual conduct with minors.

7

Defendant contends it was an abuse of discretion and violation of due process to admit the evidence. He argues the evidence was more prejudicial than probative, claiming the allegations were too remote in time, the prior acts were dissimilar to the charged crimes, the allegations were likely to confuse, mislead, or distract the jury, the allegations lacked corroboration, the uncharged acts were too burdensome for him to defend against, and the trial court failed to consider less prejudicial alternatives to admitting the sisters' testimony. Claiming that Evidence Code section 1108 unconstitutionally permits juries to convict based on propensity evidence, defendant concludes the evidence prejudiced him and violated his right to due process.

Generally, evidence of prior misconduct is not admissible to prove propensity to commit the charged conduct. (Evid. Code, § 1101, subd. (a).) However, evidence that a person committed other acts can be admissible when relevant to prove some fact—i.e., motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident—other than his or her disposition to commit such an act. (*Id*., Evid. Code, § 1101, subd. (b).) And, as relevant here, "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (*Id*., Evid. Code, § 1108, subd. (a).)

Thus, if the evidence is admissible under Evidence Code section 1108, the trial court must "exclude [it] if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) In conducting this weighing process, the trial court considers the " 'unique facts and issues of each case . . . .' " (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1116.) " 'Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of

8

confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citation.]' " (*Id.* at pp. 1116-1117.)

We review a trial court's decision to admit evidence of a prior sexual offense under Evidence Code sections 352 and 1108 for an abuse of discretion. (*People v. Avila* (2014) 59 Cal.4th 496, 515.) A discretionary decision will not be disturbed on appeal, absent " 'a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

The uncharged misconduct evidence regarding A.L. showed that defendant forced her to have intercourse with him when she was six or seven years old and defendant, who is 11 years older than A.L., was 17 or 18 years old at the time. A.L. was born in October 1997, so the acts took place in 2003 or 2004, 14 or 15 years before the charged crimes. J.L. alleged defendant molested her for one to two years, beginning when she was 13 years old. Defendant is two years older than her, so he was 15 years old when these acts started. J.L. was born in July 1988, so the acts took place between 2001 and 2002, about 16 years before the charged crimes.

Both sets of uncharged acts qualify for admission under Evidence Code section 1108. Defendant's acts with his two sisters qualify as lewd or lascivious acts involving children (§ 288), and his sexual assault of A.L. also constitutes either rape (§ 261), or, if defendant was 18 years old at the time, unlawful sexual intercourse with a minor (§ 261.5). His claim that Evidence Code section 1108 violates due process has been rejected by the California Supreme Court (*People v. Falsetta* (1999) 21 Cal.4th 903, 916-919), a decision we are bound to follow. (*Auto Equity Sales, Inc. v. Superior Court*

9

(1962) 57 Cal.2d 450, 455.) We accordingly reject defendant's facial attack on Evidence Code section 1108. We also find no abuse of discretion in admitting the uncharged sexual misconduct evidence.

We agree with the trial court that the evidence of defendant's prior misconduct was particularly relevant as it showed a sexual attraction to minors, and, more importantly, to females in his immediate family. There are differences between the charged and uncharged offenses, defendant was much younger when he committed the uncharged acts, he is only two years older than J.L., A.L. was younger than H. was when she was molested, and J.L. was older than H. was when defendant committed the uncharged sex offenses against her, but these differences do not materially diminish the relevance of the prior incidents.

Defendant claims his conduct with A.L. is too dissimilar to the charged offenses because the conduct of the sexual assaults against A.L. involved the use of force and level of penetration greater than that in the charged crimes. These differences are not so great as to weigh against admission with any significance. There is some evidence defendant used force in the charged crimes, as H. testified that defendant squeezed her tightly when pressing his penis against her so that she could not move. H. told the forensic examiner that defendant pulled her back down when she moved upwards to avoid feeling his penis, and she sometimes asked defendant to loosen his arms because she could not breathe. While, as defendant notes, he actively pursued A.L., he did not have to do so to commit the crimes against H. because he required H. to sleep with him. " ' "[T]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108." ' [Citation.]" (*People v. Cordova* (2015) 62 Cal.4th 104, 133.) Even though the charged and uncharged acts were not

10

identical, there were similarities sufficient to give the uncharged acts additional relevance.

We are also unpersuaded that the uncharged acts were unacceptably remote. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 992 [listing cases affirming admission of evidence of prior sexual crimes that occurred decades before the current crime]; *People v. Pierce* (2002) 104 Cal.App.4th 893, 900 [where crimes are substantially similar, any prejudicial effect of remoteness may be mitigated]; *People v. Branch* (2001) 91 Cal.App.4th 274, 284 ["No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible"].) The approximate 14-to 16-year gap between the uncharged and the current offenses in this case does not counterbalance the similarities between the crimes such that the prior acts should not have been considered.

In asserting the crimes were too remote, defendant relies on our opinion in *People v. Harris* (1998) 60 Cal.App.4th 727, but we find that case very different. In *Harris* the prior conviction involved a violent and bloody sexual assault in which defendant's role was unclear, while the charged offense involved defendant's nonviolent sexual touching of an institutionalized victim. (*Id*. at p. 738.) The disparity of the offenses and the use of the violent assault to prove the less aggressive crime resulted in prejudice for multiple reasons. (*Id.* at pp. 738-741.) Such disparity between charged and uncharged offenses is not present here.

Neither of the reasons for exclusion under Evidence Code section 352 applies here. The prejudice referred to in Evidence Code section 352 applies to evidence that "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1396.) The prior crimes were not unduly prejudicial in the context of the charged offenses. Defendant was charged with repeatedly molesting his eight-year-old daughter. Viewed in the context of the charged crimes, the acts against A.L., when defendant was

11

14 to 15 years old, or J.L., when she was 17 or 18 years old, would not evoke the sort of emotional bias warranting exclusion under Evidence Code section 352. The uncharged evidence was presented through the testimony of the two complaining witnesses and there is no evidence in the record that this took excessive time or delayed the trial. While defendant was not punished for the prior crimes, this does not render the uncharged crimes evidence prejudicial here. The evidence involved distinct acts with different alleged victims; it was not likely to confuse a jury that was instructed with CALCRIM No. 1191A that it could not convict based solely on the uncharged offenses.

In light of the manifest relevance of the uncharged sex crimes and the lack of reasons justifying exclusion, it was within the trial court's discretion to admit the evidence. For this reason, we likewise reject defendant's as applied due process challenge to the decision to admit the evidence. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1035 ["Application of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights"].)

II

*CSAAS Profile Evidence*

Defendant claims it was prejudicial error to allow testimony by the CSAAS expert to describe profiles of child molesters and victims. The contention is based on the expert's testimony: (1) that most child sexual abusers are men, and most child victims are female; (2) for most child victims, the perpetrator tends to someone in the child's circle of trust, such as a caregiver, coach, family acquaintance, or someone with whom they have a good relationship; (3) over time, the perpetrator tends to introduce some inappropriate touch to the child, doing so gradually with ambiguous touching at first; (4) the most common presentation of child sex abuse is the abuser is someone the child loves and trusts; (5) child sex abusers groom the children using a positive relationship to systematically prepare the child for sexual abuse and to stay quiet; (6) abusers begins with appropriate touching, then progresses to inappropriate touching to very

12

inappropriate touching in order to keep the child quiet; and (7) the expert typically does not see situations in which the abuser's first touches on the child are full blown molestation or intercourse.

Defendant did not object to the allegedly improper testimony, forfeiting his contention on appeal. (Evid. Code, § 353, subd. (a); see *People v. Holford* (2012) 203 Cal.App.4th 155, 168-170.) Anticipating the forfeiture, defendant asserts the failure to object constitutes ineffective assistance. We disagree.

"A profile ordinarily constitutes a set of circumstances—some innocuous— characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile. [Citations.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1226 (*Prince*).)

In *Prince*, the California Supreme Court concluded that the evidence complained of on appeal was not profile evidence, as follows: "[The expert's] testimony did not evaluate defendant's behavior against a pattern or profile. [The expert] did not offer an opinion that he believed defendant was the culprit, nor did he relate his findings to defendant at all. Instead, he compared documentary evidence of the crime scenes in the present case and based upon his observation of common marks and his experience, concluded the crimes had been committed by a single person. In any event, profile evidence does not describe a category of always-excluded evidence; rather, the evidence ordinarily is inadmissible 'only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative.' [Citation.] In sum, '[p]rofile evidence is objectionable when it is insufficiently probative because the conduct or matter that fits the profile is as consistent with innocence as guilt.' [Citation.]" (*Prince, supra*, 40 Cal.4th at p. 1226, italics omitted.)

Here, as in *Prince*, the expert did not evaluate defendant or his behavior, and she did not offer an opinion that she believed defendant committed the crimes. The evidence

13

was introduced to assist the jury in determining the victim's credibility in light of common characteristics of child victims of sexual molestation, thus helping the jury to understand topics such as delayed disclosure. Therefore, any objection to the testimony as improper profile evidence would have been denied, and defendant has accordingly failed to carry his burden of establishing trial counsel's substandard performance. (See *People v. Thompson* (2010) 49 Cal.4th 79, 122 ["Counsel is not ineffective for failing to make frivolous or futile motions"].)

## III

### *Failure to Redact the Police Interview*

Defendant next contends trial counsel was ineffective in failing to seek redaction of parts of his interview with law enforcement in which the interviewing officer, Detective Hodges, accuses him of being the perpetrator, claims his denials were false, and told defendant H. was telling the truth when she accused him of molesting her. He claims such statements were inadmissible, prejudicial to the defense, and should have been redacted from the interview.

Defendant's interview with law enforcement was presented to the jury in its entirety. The allegedly offending statements take place during two exchanges. During the interview, after defendant said his brother sleeps in the same room as defendant and H., Detective Hodges said, "I don't believe you." Defendant started to respond, but Detective Hodges interrupted and told defendant, "I know you're lying about something. I just want you to come clean and tell me what—what—what's really going on." Defendant replied, "I would tell you if I know."(*Sic*.) Detective Hodges asked defendant to tell her; shortly thereafter defendant said, "No, I don't know what happened. I told you. Like, I'm lost."

Later in the interview, Detective Hodges tells defendant, "[A]nd, like, personally, just the way it looks, and from what [H.] even said, I feel like it's—it's not—it was acid—almost not accidental, 'cause you don't—you're unaware of it, probably, but that it

14

did happen. And I'm just trying to make sure that we—if—if you're saying no, it didn't, and it probably did, why are—why are we not coming to an agreement. How can we get to the same page[?]" After summarizing what defendant had told her, Detective Hodges next said to defendant, "She would cuddle up next to you. But then something—she's feeling something." Defendant replied, "Well, I don't know what she's feeling . . . ." Detective Hodges said she did not believe H. was lying and "I've been in this job for almost 13 years, and I don't think she's lying to me." Defendant responded, "Hm. See, I don't know, like . . . ." Detective Hodges next reiterated her question whether defendant thought H. was lying; defendant replied, "To my knowledge, you know, I don't know, like, if she felt it or not."

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

We will not reverse for ineffective assistance of counsel if there was a reasonable tactical reason for counsel's action. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Here, we perceive a tactical purpose in not objecting to Detective Hodges's statements. Counsel could reasonably determine that, by maintaining his innocence in the face of repeated accusations from Detective Hodges and claims from her that H. was not lying, defendant's claims of innocence were more credible than if the allegedly offending statements were redacted from the interview. Defendant's claim of ineffective assistance of counsel is therefore without merit.

IV

*Cumulative Error*

Defendant asserts his convictions should be reversed for cumulative error. Defendant has identified no trial error to accumulate, so his contention necessarily fails.

15

V

*Section 288.1 Report*

Defendant's final claim is that the trial court drew materially false conclusions from the section 288.1 report, requiring the sentence to be vacated and the matter remanded for resentencing.

*A. Background*

At the defense's request, the trial court ordered a section 288.1[2] evaluation of defendant before sentencing. The trial court posed six questions to the evaluating psychologist, Dr. Lisa Boal Perrine:

"1. Is the defendant, by reason of mental defect, disease, or disorder predisposed to the commission of a sexual offense?

"2. If so, is the defendant predisposed to such a degree that he is dangerous to the health and safety of others?

"3. Is the defendant unsuitable for probation because of mental disease, defect, or disorder?

"4. Is imprisonment of the defendant not in the best interest of the child?

"5. Is rehabilitation of the defendant feasible in a recognized treatment program designed to deal with child molestation, and if the defendant is to remain in the household, a program that is specifically designed to deal with molestation within the family?

---

[2] Section 288.1 states: "Any person convicted of committing any lewd or lascivious act including any of the acts constituting other crimes provided for in Part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years shall not have his or her sentence suspended until the court obtains a report from a reputable psychiatrist, from a reputable psychologist who meets the standards set forth in Section 1027, as to the mental condition of that person."

16

"6. Is there no threat of physical harm to the child victim if there is no imprisonment?"

In response to the first question, the psychologist found there was "no evidence the defendant is predisposed to commission of a sexual offense. Dr. Perrine found the charged and uncharged offenses were "likely crimes of opportunity rather than predatory in nature," which involved no penetration or apparent coercion. She stated the second question not applicable, and, in response to the third question, concluded defendant was not unsuitable for probation for mental health reasons as he had no current or prior mental health diagnosis. Dr. Perrine noted defendant had a stable employment history since the age of 18 years old, has no prior legal history, and there was "no evidence of impulsive acting out behaviors or substance abuse history that would suggest he might not comply with probation." In response to the fourth question, Dr. Perrine stated imprisonment was not in the child's best interests, as it would reduce resources for the family, including H. She answered the fifth question by concluding rehabilitation of defendant was "feasible in a recognized treatment program designed to deal with child molestation and specifically designed to deal with molestation within the family." Noting defendant repeatedly denied the charges and uncharged offenses, Dr. Perrine "strongly recommended" such treatment. Regarding the last question, she found the risk of physical harm to H. if defendant is not imprisoned to be "greatly reduced because she now resides with her mother . . . ." Dr. Perrine recommended a probation condition prohibiting defendant from residing with female children under the age of 14.

The trial court addressed its concerns with the report at sentencing as follows:

"Section 3, there's no evidence of impulsive acting out. Sure there is. That's what this crime is all about. She then says it's a crime of opportunity. That's the basis of impulsive acting out.

"She wants to say that in section 2, I think, likely crimes of opportunity in section 1, and then section 3, no evidence of impulsive acting out.

17

"If it's not impulsive acting out, it's premeditated assaults on a child. So you can't have it both ways.

"Section 4, she says, well, because the defendant worked at Flowmasters—and I have absolutely no information about what the mother does for a living—well, the money would be useful to the victim child. Well, she doesn't know what—Dr. Perrine, when she writes the report, doesn't even gather information about the occupation of the mother, who may be perfectly capable of supporting the child, which would be something that somebody should consider.

"She then says, in section 5, 'assuming conviction.' He was already convicted at this point this report was written, so how would she write a report following a sentence where she says he repeatedly denied the charges, as well as previous allegations by his sister, and then writes, assuming a conviction—well, he's already been convicted.

"So I guess I'm not entirely sure what Dr. Perrine's thought process was when she authored this report. It appears that she didn't realize a conviction had taken place and she writes things that to the Court seem at odds with one another."

The trial court said it would have considered probation had this been "an isolated incident or a single count", but there was evidence of "a longstanding sexual deviation toward young girls, and young girls, specifically, the defendant's own children." The court was completely unimpressed with Dr. Perrine's report, as "it appears to minimize things that I think are significant and emphasizes things to which they're inaccurate." It also found the recommendation to keep defendant out of custody "without inquiring as to the financial abilities of the mother in the current situation is not particularly helpful to the court."

The trial court continued: "Coming to the conclusion there's no evidence of impulsive actions would cause the Court to have to come to the conclusion that these were premeditated instances. And perhaps they were, given the fact that the defendant removed his son from the bedroom and then required the daughter to sleep with him and

18

then conducted himself in the way that the testimony came out would certainly be an indication of premeditated conduct."

It then denied probation and imposed a 12-year state prison term.[3]

*B. Analysis*

Defendant claims the trial court violated his right to due process by imposing a sentence based on material misinformation. According to defendant, the trial court erred "in finding, that Dr. Perrine mischaracterized the offenses simply because she said they did not demonstrate a level of impulsive behavior that would make [defendant] a poor candidate for probation." He asserts the trial court compounded the error "by rejecting Dr. Perrine's concern that incarcerating [defendant] would adversely affect H., simply because Dr. Perrine did not determine how much money H.'s mother made to support her." He claims these specific errors were compounded by the fact that the trial court used this misinterpretation to determine the section 288.1 report lacked credibility. Finding the trial court "imputed materially false and derogatory information to [defendant] based on its misreading of Dr. Perrine's report" and because it "relied on its materially false and derogatory interpretations of the facts to deny probation," defendant concludes the sentence violated due process.

While a sentencing or probation hearing is not required to have the same procedural safeguards required at trial, such a hearing violates due process if it is fundamentally unfair. (*People v. Peterson* (1973) 9 Cal.3d 717, 726.) Fundamental unfairness may arise if a court relies on factually erroneous sentencing reports or other

---

[3] This was in line with the probation report, which recommended a 12-year term based on the aggravating factors that the crimes involved planning (Cal. Rules of Court, rule 4.421(a)(8)); defendant took advantage of a position of trust or confidence in committing the offenses (Cal. Rules of Cout,rule 4.421(a)(11)), and defendant engaged in violent conduct which indicates a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)). The report also noted defendant's Static-99R risk assessment score placed him in the average risk category to reoffend within five years if granted probation.

incorrect or unreliable information. (*People v. Eckley* (2004) 123 Cal.App.4th 1072, 1080 [material factual inaccuracies in sentencing documents rendered sentencing fundamentally unfair].) However, a trial court is deemed to have considered all relevant criteria in deciding whether to grant probation or in making any other discretionary sentencing choice, unless the record affirmatively shows otherwise. (Cal. Rules of Court, rule 4.409; *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1313, disapproved on another ground in *People v. Cook* (2015) 60 Cal.4th 922, 939.)

The trial court did not rely on material factual inaccuracies in rendering the sentence. It correctly pointed out that Dr. Perrine's finding in response to question four that defendant had no history of impulsive behavior which would render him unsuitable for probation contradicted her answer to question one where she said the crimes were opportunistic rather than predatory. It was also reasonable for the trial court, which presided over the trial and saw the evidence of defendant's guilt, to implicitly find fault with the response to question one by pointing out that there was evidence of premeditation, namely defendant committing the crimes after getting H.'s brother to sleep elsewhere and by requiring H. to sleep with him. Likewise, there was nothing unreasonable or erroneous in the trial court's conclusion that the failure to consider the mother's earning capacity diminished the credibility of Dr. Perrine's finding that imprisoning defendant would adversely affect H. by depriving the family of resources.

The trial court is entitled to evaluate the weight to be given to a psychological evaluation. (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329.) The court's sentencing decision was not based on its reasons for finding the report not credible but rather was based primarily on the numerous instances of molestation in the charged and uncharged offenses. It was within the court's discretion and no deprivation of due process to deny probation and impose the 12-year state prison term.

20

## VI

### *Abstract Error*

The Attorney General correctly identifies an error in the abstract, which mistakenly sums the total sentence as eight rather than the imposed term of 12 years.  In a conflict between the abstract and the judgment orally pronounced by the court, the oral pronouncement controls.  (*People v. Zackery* (2007) 147 Cal.App.4th 380, 386.)  We shall order a correction to the abstract.

### DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment showing defendant was sentenced to a 12-year state prison term and to forward a certified copy to the Department of Corrections and Rehabilitation.

_____\s\_____,
BLEASE, Acting P. J.

We concur:

_____\s\_____,
MAURO, J.

_____\s\_____,
KRAUSE, J.

21